**STATE STREET TRUST CO. v. UNITED STATES.**

No. 6945.

District Court, D. Massachusetts.

March 11, 1941.

Frederick H. Nash, of Boston, Mass., for plaintiff.

Edmund J. Brandon, U. S. Atty., and C. Keefe Hurley, Asst. U. S. Atty., both of Boston, Mass., and George H. Zeutzius, Sp. Asst. to Atty Gen., for defendant.

McLELLAN, District Judge.

This action for the recovery of income taxes hinges upon a transaction of March 5, 1930, when the plaintiff's testatrix exchanged 36 shares of common and 2,500 shares of preferred stock of Massachusetts Utilities Associates for 3,768 shares of International Hydro-Electric System, under the circumstances and subject to the conditions or obligations hereafter stated.

The petition or complaint contains two counts. The first count proceeds on the theory in substance that the transaction involved no taxable gain or loss because what the plaintiff received had no fair market value within the meaning of Section 111(c) of the Revenue Act of 1928, 26 U.S.C.A. Int.Rev.Acts, page 376, which reads:

"§ 111. Determination of Amount of Gain or Loss. * * *

"(c) Amount Realized. The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received."

Consequently, the claim stated in the first count is that plaintiff should recover such portion of taxes collected as was incident to the commissioner's determination that the transaction involved a taxable gain. The second count seeks more money than does the first count upon the theory that if what the plaintiff got out of the transaction had a fair market value within the meaning of the statute, that value was so little and the resulting loss so great the plaintiff should recover the whole of the income taxes paid for the year 1930. The petitioner now expresses a preference for the soundness of its claim as set forth in the first count, and urges the second count only in the event of a failure to maintain the action on the first count.

The defendant contends that the transaction of March 5, 1930, involved a taxable gain in the amount determined by the commissioner.

Accordingly a crucial question, the question requiring longer consideration than any other, is whether the International Hydro-Electric System Class "A" shares, as restricted, had an ascertainable "fair market value" within the meaning of Section 111(c) of the Revenue Act of 1928 supra.

### Findings of Fact.

The case was heard upon an agreed statement of facts and upon evidence adduced at the trial. These findings of fact, accordingly, are based in part upon the agreed facts, and in part upon other evidence not inconsistent therewith. The facts so far as they go are as stated in the agreed statement of facts, and are incorporated herein by reference. The agreed statement shows in substance that the plaintiff's testatrix, referred to hereafter as the taxpayer, had bought, after March 1, 1913, and before March 5, 1928, 36 shares of the common and 2,500 shares of the preferred stock of Massachusetts Utilities Associates, a Massachusetts voluntary trust, at a cost of $77,024.22. The agreed statement of facts also shows, and I find as follows:

On or about March 5, 1930, the taxpayer exchanged the Massachusetts Utilities Associates stock for 3,768 shares of Class "A" stock of International Hydro-Electric System, a Massachusetts voluntary trust.

"In making this exchange, the plaintiff's testatrix acted as one of a group of shareholders of Massachusetts Utilities Associates, and the exchange was made under an agreement dated March 5, 1930, between the members of this group, and New England Power Securities Company, a Massachusetts voluntary trust, which received from them the Massachusetts Utilities Associates shares, and delivered to them the International Hydro-Electric System Class 'A' shares."

The agreement above referred to, which "was executed in behalf of the plaintiff's testatrix by Arthur E. Childs and other principal share-holders of Massachusetts Utilities Associates who represented her in negotiations for the exchange," reads:

"March 5, 1930.
"New England Power Securities Company
"89 Broad Street
"Boston, Mass.

"Dear Sirs: We, Arthur E. Childs, Philip M. Childs, Henry A. Wyman, Francis P. Sears, Channing H. Cox, George F. Howland, and Guy W. Cox, own or control, and this letter has reference to, approximately 15,000 Preferred Shares and 13,000 Common shares of Massachusetts Utilities Associates, (the latter being represented by Voting Trust Certificates)—which shares are referred to in this agreement as 'our shares'.

"We agree to exchange the whole and not a part of our shares as follows:

"For each Preferred Share of Massachusetts Utilities Associates one and one-half (1½) shares of Class A stock of International Hydro-Electric System;

"For each Common Share of Massachusetts Utilities Associates represented by said Voting Trust Certificates one-half (½) shares of Class A Stock of International Hydro-Electric System.

"You will deliver the above mentioned Class A Stock to us against delivery by us to you of Certificates representing our Preferred Shares and Voting Trust Certificates representing our Common Shares (in both cases endorsed in Blank and accompanied by the necessary transfer stamps or funds therefor) at The First National Bank of Boston, 17 Court Street, on such date as we may mutually agree upon but not later than March 15, except in the case of Francis P. Sears, whose shares shall be delivered on or before April 15, 1930. Dividends shall be adjusted in cash as of the date of such delivery.

"None of the Class A Stock so acquired by us shall be disposed of without your consent for a period of twelve months from the date hereof.

"If the foregoing is agreeable to you, your signature on the space below provided on the original or a copy of this letter will constitute a contract between us on the foregoing basis.
            "Yours very truly,
            "(signed)   Arthur E. Childs
                    "Philip M. Childs
                    "George F. Howland
                    "Guy W. Cox
                    "Channing H. Cox
                    "Henry A. Wyman
"Accepted:   March 5, 1930.

"The name 'New England Power Securities Company' means the Trustees for the time being (as Trustees but not individually) under an Agreement and Declaration of Trust dated March 1, 1926, which is hereby referred to, and a copy of which has been filed with the Commissioner of Corporations and Taxation of the Commonwealth of Massachusetts. Any agreement, obligation or liability made, entered into or incurred by or in behalf of said Company binds only the trust estate, and no Shareholder, Director, Trustee, Officer or Agent assumes or shall be held to any liability by reason thereof.
"New England Power Securities Company
    "By (signed)   Arthur E. Pope
                "Richard S. Pattee
                "Carl S. Hermann
                            "Trustees" .

The taxpayer's Massachusetts Utilities Associates shares were included in the shares referred to in the agreement as "our shares", and the shares of International Hydro-Electric System Class "A" received under the agreement aggregated 28, 118.

Under another agreement, 15,000 other shares of International Hydro-Electric System Class "A" stock were delivered by New England Power Securities Company to Arthur E. Childs. This agreement reads:

"New England Power Securities Company
            "89 Broad Street
        "Boston, Massachusetts
                    "March 4, 1930
"Arthur E. Childs, Esq.,
"77 Franklin Street
"Boston, Massachusetts
"Dear Sir:

"The name 'New England Power Securities Company' means the trustees for the time being (as trustees but not individually) under an agreement and declaration of trust dated March 1, 1926, which is hereby referred to, and a copy of which has been filed with the Commissioner of Corporations and Taxation of the Commonwealth of Massachusetts. Any agreement, obligation or liability made, entered into or incurred by or in behalf of said company binds only the trust estate, and no shareholder, director, trustee, officer or agent assumes or shall be held to any liability by reason thereof.

"If you will agree to furnish us for a period of ten years from the date hereof with your services as consultant and general adviser in such matters as we or New

England Power Association may reasonably request, and which in your judgment shall not unduly interfere with your other business obligations and activities, and will also undertake during such period to advise us as fully as may be in connection with matters concerning the Massachusetts Utilities Associates and its subsidiaries, we will:

"(1) Cause to be paid you forthwith the sum of Seventy-five Thousand Dollars in cash;

"(2) Give you the right to purchase for a period of thirty days from the date hereof Fifteen Thousand fully paid and non-assessable shares of Class A stock of International Hydro-Electric System at $5.00 per share.

"In case you should exercise the above mentioned right to purchase, you agree that you will not dispose of any of said shares of Class A Stock so acquired without our consent for a period of twelve months from the date of purchase.

"Your acceptance signed below will constitute a contract between us on the foregoing basis.

"Very truly yours,
    "New England Power Securities
        Company
    "By /s/ Arthur E. Pope
    "/s/ Richard S. Pattee
    "/s/ Carl S. Herrmann
                "Trustees"
"Accepted:
"/s/ Arthur E. Childs."

"The 43,118 (28,118 plus 15,000) shares of International Hydro-Electric System Class 'A' stock thus received by the plaintiff's testatrix and the other members of her group of owners of Massachusetts Utilities Associates comprised the entire block received pursuant to the agreements dated on or about March 5, 1930. The commissioner of Internal Revenue determined that the 3768 shares of International Hydro-Electric System Class 'A' stock had a fair market value on March 5, 1930, of $44.00 a share, the price at which shares of that stock were sold on the New York Stock Exchange on that date, and that the total amount realized by the taxpayer as a result of the receipt of the 3768 shares was $166,833.67, which included accrued dividends," and determined a taxable gain in the sum of $89,809.45, "representing the excess of said $166,833.67 over $77,024.22, the cost of said stock to plaintiff's testatrix." There was assessed a resulting additional tax of $11,308.32, together with interest of $2,657.45, or a total of $13,965.77, which was paid by the taxpayer on March 9, 1935.

Theretofore the taxpayer had filed a claim for refund of a tax of some $3,000 already paid, upon the theory that the transaction of March 5, 1930, resulted in a deductible loss. The additional assessment of $13,965.77 having been made, the taxpayer seasonably filed a claim for refund "of $14,026.06 ($13,965.77 and interest thereon to the date of the claim), plus interest, in addition to the amount of $3,116.93, representing the tax paid under the return as filed and claimed in the said refund claim filed on March 14, 1933."

Inasmuch as the defendant objected to evidence tending to show the speculative quality of the Class "A" stock received by the taxpayer, and now contends that the claim for refund furnishes no adequate basis for the admission of such evidence, attention is here directed to the reasons for refund there appearing. They are:

"(a) On various dates prior to March 5, 1928, and subsequent to March 1, 1913, the claimant purchased 36 shares of common and 2500 shares of preferred stock of Massachusetts Utilities Associates (hereinafter referred to as 'M. U. A.') at a total cost of $77,024.22.

"(b) Pursuant to a contract between New England Power Securities Company and Arthur E. Childs, et als., dated March 5, 1930, a copy of which is hereto annexed, marked Exhibit 'A', the claimant delivered to New England Power Securities Company the above-mentioned 36 common shares and 2500 preferred shares of M. U. A. stock and received in exchange on or about March 5, 1930, 3768 shares of International Hydo Electric System (hereinafter referred to as 'Hydro') Class 'A' Stock. Under the terms of the said contract the claimant was precluded from disposing of her Hydro stock within a period of twelve months from March 5, 1930, and none of said stock was sold or otherwise disposed of by her during that period. The total number of Hydro shares received by the group of individuals included in said contract aggregated 25,291.

"(c) The said 3768 restricted Hydro shares received by the claimant in exchange for her M. U. A. stock had no fair market value within the meaning of the Revenue Act of 1928, at the time of their receipt by the claimant on March 5, 1930, or at any time during the year 1930. The

claimant, therefore, received no taxable income in connection with the receipt of said restricted shares.

"(d) The Commissioner, however, has erroneously found that the said restricted shares had a fair market value, and that said alleged fair market value was $44 a share. He has further erroneously found that the total amount realized in connection with the receipt by the claimant of the restricted Hydro shares was $166,833.67, and he has added to the claimant's income the amount of $89,809.45 as alleged gain on the exchange, this amount being the difference between $77,024.22 and $166,833.67. On the said addition to income of $89,809.45 the Commissioner has erroneously assessed and collected an additional tax of $11,308.32, plus interest of $2657.45, totalling $13,-965.77, which amount, together with interest thereon, is included in this claim for refund.

"(e) If the claimant's contention that the restricted Hydro shares hereinbefore referred to had no fair market value within the meaning of the law should be disapproved, and if it should be held that the said shares had a market value and that said market value was a fair market value, the claimant states, upon information and belief, that the fair market value of said restricted Hydro shares on March 5, 1930, was not in excess of $10.00 a share. The claimant, therefore suffered a loss in the amount of at least $39,384.22, which was not claimed in her return, in connection with the 3768 of said shares received in exchange for her M. U. A. stock. This loss was in excess of the claimant's income for 1928 and no income tax was therefore due from her for that year. In connection with her return for the year 1928, the claimant paid an income tax of $3,116.93. A refund claim in that amount, embodying this alternative claim of the claimant's, was duly filed with the Collector of Internal Revenue at Boston, Massachusetts, on March 14, 1933. This refund claim, which was subsequently disallowed by the Commissioner, is not superseded by the instant claim, but should be considered in connection with it."

As stipulated, "shares of International Hydro-Electric System Class A stock not involved under the said agreements dated March 4 or March 5, 1930, were sold on the New York Stock Exchange on March 5, 1930, at $44 a share and said price was the fair market value of such shares so sold."

But as I view it, the problem here presented is whether the restricted shares had a fair market value within the meaning of 111(c) of the Revenue Act of 1928, and if so, what that fair market value was on March 4 or 5, 1930.

The agreed statement of facts furnishes no answer, and it becomes necessary to consider other evidence adduced at the trial. I take it that a security may be so seasoned and have had such an industrial price history that it has a market value within the meaning of the taxing act, though the holder received it under the terms of an agreement forbidding its sale for an appreciable period of time, such as even a year. That a security may be so speculative as to have no such fair market value if its sale is thus restricted seems to be the teaching of Helvering v. Tex-Penn Oil Company, 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755. Accordingly, findings based upon the evidence as to the nature of the stock received by the taxpayer are here required.

Upon all the evidence, oral and documentary, I find as follows:

In March, 1930, International Hydro-Electric System was a highly pyramided Massachusetts trust, having a funded debt of some $30,000,000. It had outstanding 773,975 Class "A" shares, 1,000,000 Class "B" shares, and 40,000,000 common shares. The Class "A" stock was entitled to preference over the Class "B" and the common stock, both as to dividends and in liquidation. International Hydro-Electric System was controlled through stock ownership by International Paper and Power Company. Its assets consisted in large part of enough shares to furnish control in New England Power Association, which in turn had many subsidiaries. It had also a controlling stock interest in Canadian Hydro-Electric Corporation, Ltd., and the latter had several subsidiaries.

International Hydro-Electric System had been organized no earlier than March 25, 1929, and was a comparatively new enterprise. Some time during the year 1929, the Class "A" shares of International Hydro-Electric System were listed on the New York Stock Exchange, and both before and after March 5, 1930, its unrestricted shares were subject to violent fluctuations. For the year 1930, the high price was $54 a share, and the low $18⅛; in the first half of 1931, the range was from $31 a share to $16¾ a share. The plaintiff offered to

show that in about June, 1932, the stock descended to below $3 a share, but feeling that such evidence was remote, I excluded it subject to the plaintiff's exception. Class "A" stockholders received dividends at the rate of $2 a year (with an option in some quarters to take stock instead of cash), from 1929 into the year 1932, when dividends ceased.

Mr. Orrin G. Wood, a witness called on behalf of the plaintiff, having expressed his view, as did other witnesses qualified to express an opinion upon the subject, that the restricted Class "A" shares did not have a fair market value in 1930, was then requested to state "what if any * * * were the hazards to the purchase of this stock, the Class 'A' stock?" His reply, which I find to be in accord with the facts, was in part substantially as follows:

"A. First, I think that the company was a new venture. It had been in existence only approximately nine months, approximately a year at the time this transaction took place. Second, the company was a highly pyramided holding company. Third, the stock of the company was being continually issued. And fourth, the nature of the security itself, it seems to me, was intrinsically a security which admitted that there were risks attached to the purchase of the stock.

"Treating the first subject, International Hydro-Electric Company was a holding company. It held the stocks of two other holding companies, one of which was in turn a partial holding company, namely, the New England Power Company, of which it owned 82 per cent of the common stock. It owned the junior stocks of the Canadian Hydro-Electric Company, which in turn was a holding company owning operating companies in Canada.

"The New England Power Association itself had been in existence for approximately four years. The Canadian Hydro-Electric Company had been in existence for approximately three years. This company had been in operation approximately nine months. It had paid just three dividends on the Class A stock when this transaction took place, and it was to pay only nine more in its entire career.

"In the second place, the company was a very highly pyramided holding company; although I might say in addition to that, Your Honor, that the Company was in itself a sub-holding company, because its junior securities, the Class B and common stocks, were held by the International Paper & Power Company, which itself was a holding company owning the stock of this company, and of the International Paper Company. The company had a very heavily pyramided capital structure. And if I may just look at these figures just a minute—"

An objection having for the first time been interposed to Mr. Wood's testimony was at this stage overruled, and Mr. Wood proceeded and I find as follows:

"A. (Continuing.) The International Hydro-Electric System, taking the consolidated balance sheets as shown in their annual reports,[1] shows that 83.3 of its capital structure in 1929, December, 1929, was prior to the Clause A stock of the International Hydro-Electric System; and that junior to the Class A stock of the International Hydro-Electric System there remained a balance of assets of about 9 percent. In the year 1930, at the end of the year 1930, the senior securities had risen to 84.1 percent, and the balance of assets for the Class A stock was 5.9, and the remaining balance 9.3; so that you might say that you were dealing in a margin of less than 10 percent, with less than 10 percent protection in your assets, and a very heavy prior capital structure.

"The Court. As of what time are you now speaking?

"The Witness. I am speaking now, Your Honor, of the balance sheets as shown December 31, 1929, and December 31, 1930.

"A. (Continuing) This very pyramided capital structure was shown in the earnings statement. Taking the consolidated statement, it is interesting to note that for the nine months' period, the first nine months of the company's existence, only 5½ percent of the gross of this company was available for the payment of the Class A dividend. For the year 1930 only 7.4 was available. For the year 1931 only 5.2.

"Q. That is as far as we go on years. A. Yes, Well, that is as far as I go, Mr. Hall, too. And after the payment of Class A dividends for the nine months ended December 31, 1929, there was only 2.9 percent gross left over; for the year 1930, only 3.9; and for the year 1939 only 1.9 percent. I shall not go beyond that in my figures.

---

[1] The annual reports for the calendar years 1929, 1930, and 1931 had already been received in evidence.

"The Court. You just said 1939.

"The Witness. I am sorry; 1931.

"A. (Continuing.) Needless to say, that is a very slim equity of earnings being brought down for the payment of a stock. It is well known that most utility companies that are growing, and most of them are more or less fast, must retain some of their earnings after all dividend payments. And I think this is shown in the International Hydro-Electric System, that you cannot get all your net earnings into a holding company, by the fact that, for the first nine months of its operation, it received so little cash in the holding company, as from interest and dividends on junior stock, that it had a deficit from a cash standpoint of 14 cents a share, before the payment of the Class A dividends; and for the year 1930 it had income only sufficient to pay 22 cents in cash on the Class A dividends.

It is interesting also to note that the operating expenses of the International Hydro-Electric System taken as a whole, of the securities prior to the Class A stock of the International Hydro-Electric System, were such that in the years—in the nine months ended December 31, 1929, and in the year 1930, and in the year 1931, the operating expenses and the interest, and the prior charges, prior to this stock, consumed 100 per cent of the income, of the company's income from its regular operating sources, and that the company, in order to show earnings on this Class A stock, had to rely entirely on its other income, which was made up in part of interest and dividends from affiliated companies, in part of engineering fees, which were capitalized of course on construction work, and in part of interest on construction, and in part of management fees. And the other item, I think, was their merchandising revenue from selling appliances to customers. So that the Class A stock in all the period from the inception of the company until this stock was released from its restriction, relied entirely on the other operating income of the system.

"Now, I want to call attention, Your Honor, to the fact that this stock was continually being increased. As of April, 1929, the first balance sheet, there were 475,000 shares outstanding. On December 31, 1929, there were approximately 759,000 outstanding; and on December 31, 1930, 821,000 shares. And the requirements for dividends had increased during that period from $950,000 to $1,518,000, and then to $1,660,000.

"Now, the company was growing, and growing probably faster than a normal utilities system, for two reasons, growing in size: One was due to the fact that it had a considerable construction program on in Canada and in acquiring hydro-electric concerns; and in this country taking over various smaller utility companies. So that it needed, it had to have some medium of financing. That medium was in part the Class A stock; but during the two years for which I have the figures here, the senior securities of the company, senior to the Class A stock, increased during the nine months of 1929 $36,702,000 and in the year 1930 $33,425,000. And there was senior to the Class A stock of the International Hydro-Electric in April, 1929, in round figures $296,000,000 of senior securities; in December, 1929, $333,000,000 of senior securities; and in December, 1930, $336,000,000. As against that there was—this is book value—$19,475,000 of the Class A stock shown in April, 1929; $26,604,000 in December, 1929; and $28,152,000 in 1931. And during that time there had been no issuance of junior stock.

"Now, of course you cannot continue increasing your senior securities without some increase in the equities; and that leads me to the question of how the company could provide the junior equity which was necessary for the growth of this system if the Class A stock was to be protected.

"As I stated before, the Class B stocks and the common stock of the International Hydro-Electric were all owned either directly or indirectly by the International Paper & Power Company, which itself was a holding company. * * *"

The foregoing testimony here found to be true was essentially uncontradicted and it was supported in great part and supplemented by other evidence equally dependable, though less detailed.

■ I find upon all the evidence: The unrestricted Class "A" shares of International Hydro-Electric System were not of such a character as to rise to the dignity even of a businessman's investment. On the contrary, their quality was such as to appeal to the nimble trader willing to bet upon nearby fluctuations. Highly speculative and hazardous though they were, the Class "A" shares, unrestricted and susceptible to immediate delivery, had a real

market on the New York Stock Exchange, where they were listed. Their market value as of March 4 and 5, 1930, when speculative stocks and others were nearing the end of a recovery from the devastating declines of the preceding autumn, as evidenced by transactions on the Exchange, was about $44 a share. The restricted shares which the taxpayer had received subject to an agreement not to sell them for a year were not worthless. They had a value, as opposed to an ascertainable market value, in the sense that undoubtedly someone could be found to pay something for a contract for their delivery at the end of the year. Whether anyone could be found to promise a price at which a sensible owner would contract to make such a delivery is entirely problematical. Clearly enough, no reasonable person would undertake to pay as much for the restricted shares deliverable in a year as for the unrestricted shares deliverable at once.

■ The defendant, seeking to support the Commissioner's determination to the contrary, urges, as is the fact, that the restrictions upon the sale of the Class "A" shares are not apparent upon the face of the certificate. The taxpayer was nevertheless bound by her agreement and, to put it mildly, she was under no duty to conceal the truth from a prospective purchaser. Moreover, a sale of the restricted stock would have subjected her to an action for breach of the contract under which she had obtained the stock.

■ The defendant urges also that the restriction upon their sale did not affect the value of the International Hydro-Electric System Class "A" shares, because, had the taxpayer sought it, she could have obtained a waiver thereof from the New England Power Securities Company, which delivered the shares to her and imposed the restriction upon their transfer. In this connection it is noteworthy and I find that the restriction was in effect imposed from above, as the following facts indicate:

New England Power Securities Company was a wholly owned subsidiary of New England Power Association. New England Power Association, as before indicated, was controlled by International Hydro-Electric System, which was in turn controlled by the International Paper and Power Company. A large block of Hydro-Electric System Class "A" shares, which included those offered the taxpayer's group by ·New England Power Securities Company were originally owned by the International Paper and Power Company. This block of shares had been bought from that Company by International Paper and Power Securities, Inc., which was endeavoring to distribute them to the public. The shares for delivery to the taxpayer's group were loaned by International Paper and Power Securities, Inc., to New England Power Securities Company, upon the condition that the latter obtain from all persons to whom it was to be delivered a promise not to sell the shares for a year. In accordance with this condition, New England Power Securities Company imposed the restriction in question, and agreed not to give consent to any transfer in violation thereof without first obtaining the permission of International Paper and Power Securities, Inc. It is true, as the defendant asserts, and I find, that for two holders of Class "A" stock the restriction was removed. But there were special considerations which led to a waiver of the restriction in these two instances. Evidence which I accept as true indicates and I find that no general waiver of the restrictions was obtainable, and that in all probability no additional waivers would have been granted.

### The Defendant's Request for Findings of Fact.

At the conclusion of the evidence, the defendant presented a paper entitled "Defendant's Motion for Special Findings of Fact and Conclusions of Law", which amounts to a request for nine separately numbered findings of fact and three separately numbered requests for rulings of law.

Though Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides that "requests for findings are not necessary for purposes of review", I think the findings of fact here requested deserve detailed consideration.

(1) The first request, which is in substance that the facts be found as stated in the agreed statement of facts and that it be incorporated herein by reference is granted.

(2) The second request to the effect that the assessment here attacked by the plaintiff was "timely made within the statutory period therefor, duly extended by valid waivers and extensions," is granted.

(3) The third request for finding reads: "That the taxpayer, Alice Moen Childs, voluntarily entered into the transaction whereby she disposed of her Massachusetts

Utilities Associates shares for 3768 shares of International Hydro-Electric System Class A stock."

This request is granted in substance, though it is to be borne in mind that what the taxpayer received was restricted stock, and the restriction was not of her making.

(4) It will be found that the fourth request as to the number of Class "A" shares outstanding in March, 1930, has in substance been granted.

(5) I find in accordance with the fifth request that decedent (the taxpayer) did not dispose of her International Hydro-Electric System Class "A" shares during the so-called one year restrictive period; nor had she requested permission so to do. Indeed, such shares were not sold until the year 1935. Findings have heretofore been made as to what would have been likely to happen if the taxpayer had requested permission to dispose of her shares (see the findings heretofore made.)

(6) It is true as stated in the sixth request and I find that "one of the parties to the agreement, of March 5, 1930, one Channing H. Cox, sold the shares of International Hydro-Electric System Class A stock received by him, said sale occurring about April 11, 1930 and involving 500 shares at a selling price of approximately $49 a share." To the effect that the restriction was removed in favor of another stockholder, see the foregoing findings of fact upon that subject.

(7) The seventh request for findings of fact reads: "Certificates for the 3,768 shares of International Hydro-Electric System Class A stock were actually transferred to Alice Moen Childs and new certificates therefore were delivered to her in March, 1930. The shares thus delivered to her had a fair market value when received in March, 1930, of $44 per share."

As to the first sentence thereof, this request is granted in substance, though judging from the date on one certificate I find that the new certificates were delivered in April rather than in March, 1930. Insofar as the seventh request seeks a finding that the restricted shares had a fair market value of $44 per share, it is denied.

(8) The eighth request to the effect that the restriction was not endorsed upon the stock certificate has heretofore been granted in substance.

(9) The ninth request to the effect that the taxpayer realized a profit in March, 1930, when she received the Class "A" shares in the amount of $89,809.45 as determined by the Commissioner of Internal Revenue, is denied.

■ Insofar as they may be regarded as findings of fact as opposed to conclusions of law, I find on all the evidence further as follows:

(1) On March 4 and 5, 1930, in the light of the restrictions thereon and in view of their speculative character, there was no market for the taxpayer's restricted shares of Class "A" stock.

(2) The taxpayer's restricted shares had no ascertainable market value on March 4 or March 5, 1930.

(3) The taxpayer's restricted, speculative Class "A" shares had during the year 1930 no "fair value" within the meaning of Section 111(c) of the Revenue Act of 1928.

(4) The only event involving either a taxable gain or a deductible loss with reference to the taxpayer's Class "A" shares occurred in March, 1931, when the restrictions ceased by their own limitations, or in 1935, when the stock was sold.

(5) No taxable gain accrued to the taxpayer in the year 1930 in connection with the exchange of her Massachusetts Utilities Associates Stock for Class "A" shares in International Hydro-Electric System.

### Conclusions of Law.

Upon the basis of all the foregoing findings of fact, I conclude as a matter of law as follows:

(1) The defendant's three requests for conclusions of law and the defendant's motion for judgment are denied.

(2) The taxpayer's restricted speculative Class "A" shares had during the year 1930 no "fair market value" within the meaning of Section 111(c) of the Revenue Act of 1928.

(3) The only event involving either a taxable gain or a deductible loss with reference to the taxpayer's Class "A" shares occurred in March, 1931, when the restrictions upon their transfer terminated by their own limitations, or in 1935, when the stock was sold.

(4) In Helvering v. Tex-Penn Co., 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755, the Supreme Court of the United States decided that a stock of a highly speculative quality, the sale whereof was restricted for less than a year, did not have a fair market value capable of being ascertained

with reasonable certainty when acquired by the taxpayer, and the restriction here involved being for a whole year, I can find no distinction favorable to the defendant between that case and the case at bar. Nor do I find anything in Heiner v. Gwinner, 3 Cir., 114 F.2d 723, enabling me to distinguish the instant case from the Tex-Penn Company case. No taxable gain accrued to the taxpayer in the year 1930 in connection with the receipt by her of the International Hydro-Electric System Class "A" stock. The Commissioner's determination to the contrary was erroneous and the tax illegally exacted.

(5) The claim for refund described and in part copied in the foregoing findings of fact explicitly asserts that the Class "A" shares received by the taxpayer in March, 1930, had no fair market value, that the taxpayer received no taxable income in connection therewith, and is adequate.

(6) The plaintiff's cause of action substantially as alleged in the first count of the complaint is established. Accordingly, the plaintiff is not entitled to recover upon the theory set forth in the second count thereof.

Judgment is to be entered for the plaintiff in the sum of $13,965.77 with interest according to law, and with costs to neither party.