North American Philips Company, Inc. v. Commissioner.
North American Philips Co. v. Commissioner
Docket No. 77299.
United States Tax Court
T.C. Memo 1962-284; 1962 Tax Ct. Memo LEXIS 25; 21 T.C.M. (CCH) 1497; T.C.M. (RIA) 62284; November 29, 1962
*25 Held, shares of stock issued to petitioner in a taxable exchange had an ascertainable fair market value on December 24, 1954; value determined. John D. Calhoun, Esq., George G. Tyler, Esq., 15 Broad St., New York, N. Y., and George S. Parlin, Jr., Esq., for the petitioner. Howard B. Sweig, Esq., and John J. O'Toole, Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1954 in the amount of $1,335,740.06. The issues for decision are as follows: (1) Whether 279,000 shares of Reynolds Spring Company stock issued to petitioner in a taxable exchange had an ascertainable fair market value on December 29, 1954; and (2) If the stock had an ascertainable fair market value, what it was. A third issue raised by the pleadings was settled by a stipulation that petitioner is entitled to a net operating loss deduction for 1954 in the amount of $47,160.26. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. Petitioner, North American Philips Company, Inc. (hereinafter sometimes referred to as North American), *26 is a Delaware corporation. Petitioner filed its Federal income tax return for the calendar year 1954 with the district director of internal revenue, Upper Manhattan, New York. Petitioner's history stems from the Dutch corporation N. V. Philips Gloeilampenfabrieken (hereinafter sometimes referred to as Dutch Philips) of Eindhoven, Holland. Since its founding in 1891, Dutch Philips has become a large, international electronics company. In 1939, in an attempt to prevent Nazi seizure of certain of its non-European assets, Dutch Philips placed all of its United States and Latin American assets into a trust administered by the Hartford National Bank & Trust Company, Hartford, Connecticut, as trustee. In 1942, petitioner was incorporated and all of its stock was similarly placed in trust with Hartford National Bank & Trust Company. Thereafter, petitioner engaged in the manufacture of electronic equipment, producing quartz crystals, X-ray equipment, electrical wire, and power tubes as well as engaging in the export business. Petitioner subsequently directed most of Dutch Philips' United States activities. A. W. Haydon (hereinafter referred to as A. W.) was an inventor who had designed *27 and patented certain precision electrical timing and governing devices which were well-known for their accuracy despite fluctuations in voltage, temperature, and shifting powerloads. In 1945, A. W. formed The A. W. Haydon Company (hereinafter referred to as the Haydon Company) to manufacture these devices which were used in aircraft, guided missiles, radar, atomic energy, turbo jet engines, telemetering equipment, tuning motors and telephonic equipment. The precision electromechanical devices produced by Haydon Company were not electronic in the technical sense because they themselves did not contain vacuum tubes and transistors. The Haydon Company products were frequently used as components in electronic systems. The major buyers thereof were the electronic and aircraft industries, and the United States Government. On July 6, 1951, petitioner purchased from A. W. all of the outstanding stock (8,000 shares) of the Haydon Company for $201,676.44. Petitioner then bought the inventory and fixed assets of the Haydon Company at book value and continued the manufacturing operation as the A. W. Haydon Division (hereinafter referred to as the Haydon Division) of petitioner. On July 9, 1951, petitioner *28 appointed the Haydon Company to be the exclusive agent for the sale and distribution of the products to be manufactured by petitioner's Haydon Division. Simultaneously, Philips Laboratories, Inc. (hereinafter referred to as Laboratories), a Delaware corporation affiliated with petitioner, acquired certain patents essential to the business of Haydon Division from A. W. for $1,000,000. Thereafter, Laboratories licensed petitioner under the foregoing patents until July 1, 1954. On that date, petitioner acquired the patents when Laboratories was merged into it. Between 1951 and 1954, the Haydon Division was engaged in the manufacture of precision electrical timing devices. Its business was custom designing rather than mass production, with manufacturing operations consisting of the assembly of components for small orders. More than 80 percent of its sales were directly or indirectly to the United States for use in aircraft, missiles and electrical and electronic devices. The net incomes of the Haydon Company and the Haydon Division for various periods between October 1, 1949, and August 31, 1954, adjusted to reflect estimated provisions that would have been required if operations of *29 the Haydon Division had been conducted as a separate corporate entity, were as follows: A. W. Haydon Company
A. W. Haydon
Company
Diavision of
North
American
Philips
Fiscal Year Ended
July 6, 1951
September 30
to
1950
1951
Dec. 31, 1951
Net Sales
$571,273.13
$1,076.711.74
$1,476,859.75
Cost of Sales
352,113.76
617,771.03
783,516.33
Gross Profit
$219,159.37
$ 458,940.71
$ 693,343.42
Selling Expenses
108,314.89
171,043.45
189,273.33
Net Profit Prior to Royalties &
$110,844.48
$ 287,897.26
$ 504,070.09
Taxes
Other Deductions
Royalties
$ 40,546.45
Patent Amortization
Sundry
$ 5,999.99
$ 6,674.85
3,756.84
$ 5,999.99
$ 6,674.85
$ 44,303.29
$104,844.49
$ 281,222.41
$ 459,766.80
Discounts received
1,922.86
4,029.50
4,573.07
Net Income Prior to Taxes
$106,767.35
$ 285,251.91
$ 464,339.87
State Taxes
$ 3,300.00
$ 14,000.00
Federal Taxes
43,000.00
179,280.78
$ 46,300.00
$ 193,280.78
Balance of Net Income
$ 60,467.35
$ 91,971.13
Pro forma adjustments to reflect
esti-
mated provisions which would have
been required if the A. W. Haydon
Company Division had been operated
as a corporate entity: Provision for net renegotiation re-
funds
$ 63,000.00
Provision for State income taxes
14,000.00
Provision for Federal excess
profits
taxes
82,000.00
Provision for Federal income taxes
229,000.00
$ 388,000.00
Pro forma balance of net income
$ 76,339.87
*30 A. W. Haydon Company Diavision of North
American Philips
Year Ended
December 31
Jan. 1, 1954
to
1952
1953
Aug. 31, 1954
Net Sales
$4,486,076.10
$4,679,683.96
$3,415,649.47
Cost of Sales
2,420,376.22
2,992,527.29
2,280,706.61
Gross Profit
$2,065,699.88
$1,687,156.67
$1,134,942.86
Selling Expenses
614,870.14
690,096.30
535,363.38
Net Profit Prior to Royalties &
$1,450,829.74
$ 997,060.37
$ 599,579.48
Taxes
Other Deductions
Royalties
$ 125,826.85
$ 129,887.43
$ 67,115.58
Patent Amortization
21,566.61
Sundry
23,979.51
20,590.33
14,046.63
$ 149,806.36
$ 150,477.76
$ 102,728.82
$1,301,023.38
$ 846,582.61
$ 496,850.66
Discounts received
10,786.86
12,463.03
7,493.45
Net Income Prior to Taxes
$1,311,810.24
$ 859,045.64
$ 504,344.11
State Taxes
Federal Taxes
Balance of Net Income
Pro forma adjustments to reflect
esti-
mated provisions which would have
been required if the A. W. Haydon
Company Division had been operated
as a corporate entity: Provision for net renegotiation re-
funds
$ 164,000.00
$ 24,000.00
Provision for State income taxes
40,000.00
33,000.00
$ 19,000.00
Provision for Federal excess
profits
taxes
230,000.00
149,000.00
Provision for Federal income taxes
657,000.00
425,000.00
247,000.00
$1,091,000.00
$ 631,000.00
$ 266,000.00
Pro forma balance of net income
$ 220,810.24
$ 228,045.64
$ 238,344.11
*31 During April 1954, petitioner entered into negotiations with Reynolds Spring Company (hereinafter referred to as Reynolds) of Jackson, Michigan, for the purpose of selling substantially all the assets of the Haydon Division to Reynolds. Reynolds was to exchange its stock for the assets of the Haydon Division. At this time, Reynolds stock was sold on the New York Stock Exchange at a high of $6.50 and a low of $5. Reynolds was incorporated in 1919 and primarily engaged in the manufacture of cushion springs for the automotive industry. The company had no preferred stock or long-term debt, and its common stock had been traded on the New York Stock Exchange since 1936. After 1951 the volume of Reynolds' business steadily deteriorated so that substantial losses were sustained during 1952, 1953 and 1954. The price of Reynolds stock dropped from $26, shortly after World War II, to $5 in April 1954 when the negotiations with petitioner commenced. Prior to December 29, 1954, there were 280,000 shares of widely held Reynolds stock outstanding. The following table reflects the high and low sales prices of Reynolds stock on the New York Stock Exchange for the quarterly periods October 1, 1952 through *32 March 31, 1954: Common Stock, $1 Par
High
Low
10/ 1/52-12/31/52
7 1/2
6 1/8
1/ 1/53- 3/31/53
9 7/8
7
4/ 1/53- 6/30/53
8 5/8
6 1/2
7/ 1/53- 9/30/53
7
4 5/8
10/ 1/53-12/31/53
5 5/8
4 3/4
1/ 1/54- 3/31/54
6 3/8
5
On October 11, 1954, petitioner entered into an agreement (hereinafter referred to as the Sales Agreement) whereby Reynolds agreed to purchase operating assets and patents of the Haydon Division for 279,000 shares of newly issued Reynolds common stock. The Sales Agreement provided, in part that: (i) Reynolds agreed to purchase from petitioner certain assets of Haydon Division consisting in general of inventory and work in process, fixtures, tools and other equipment, know-how, licenses, trade names, certain patents and such other assets as were set forth in Schedules A and B attached to said agreement (including all the outstanding shares of stock (8,000) of Haydon Company) and to assume certain liabilities of Haydon Division. The agreed net value of such assets was $1,500,000. (ii) As consideration and in payment for the assets of Haydon Division, Reynolds agreed to deliver to petitioner 279,000 shares of newly issued common stock *33 of Reynolds. (iii) Petitioner's obligations under the agreement were conditioned on Reynolds causing said 279,000 shares of Reynolds stock to be listed on the New York Stock Exchange or approved for such listing upon notice of issuance. (iv) Petitioner represented that such 279,000 shares of Reynolds were to be acquired for investment and not for distribution under such circumstances as would constitute a public offering within the contemplation of the Securities Act of 1933. (v) As a further condition to petitioner's obligations under the Sales Agreement, Reynolds was required to complete the sale of all of its operating assets to The Stubnitz Greene Spring Corporation (hereinafter sometimes referred to as Stubnitz) under the terms of an offer made by Stubnitz dated October 6, 1954. (vi) Petitioner was obligated to adjust the purchase price in the event that the pretax earnings of the assets of Haydon Division which Reynolds received in consideration for 279,000 shares of Reynolds stock aggregated less than $750,000 for the three-year period immediately succeeding December 29, 1954. On October 11, 1954, the date on which the Sales Agreement was executed, Reynolds stock *34 was traded at a high of $12.25 and a low of $11.875. On October 12, 1954, news of the Sales Agreement was released to the press. On October 13, 1954, The Wall Street Journal announced Reynolds' proposed acquisition of the Haydon Division and the sale of its operating assets to Stubnitz. Reynolds' president, Charles G. Munn, was therein noted as stating that the change in the nature of the business would be of long-term benefit to Reynolds shareholders. On October 20, 1954, the Journal of Commerce described the "major overhaul" which would result from Reynolds' entry into the precision electromechanical timing business. It was therein stated that: The Haydon transaction is novel in many respects, although the North American Philips people describe it as a "normal American business deal". * * * In acquiring Reynolds Spring, the Philips interests obtained a company which had lost money in each of the past two years, had no debt or preferred stock, a small common capitalization, and had its shares listed on the New York Stock Exchange. Reached at Jackson, Mich., by telephone, C. G. Munn, president of Reynolds Spring, expressed the opinion that the transaction is good for *35 Reynolds stockholders as they will now get earning power. Mr. Munn stated that he would not be an officer of the company once the deal is concluded, although he will continue as a director. The name of the company may be changed along with the type of business. On November 5, 1954, the stock brokerage firm of Oppenheimer, Vanden Broeck released a bulletin which stated that: The lure of the United States market has attracted Europe's industrial giants. Taking little Holland alone, Royal Dutch created our Shell Oil Co., Unilever built Lever Bros. which has made "Lux Soap" a household name * * *. A recent development suggests that a similar pattern is to be followed by the Netherlands' great name in electronics, Philips Gloeilampen, which has worldwide sales of almost a half billion dollars. * * * They include electronics research laboratories, a manufacturer of specialty electronic tubes, and others which are a cross-section of this industry. Now Philips is planning to obtain control of a U.S. corporation, listed on the New York Stock Exchange. * * * Experience with the activity in corporate purchases and mergers over the last few years suggests that any well-managed and well-financed *36 company, which has a New York Stock Exchange listing, can use its shares to acquire other companies. In our opinion it is logical to expect that * * * North American Philips is well aware of the fact that it has acquired control of an instrument which can be used to purchase other companies without substantial cash. Further, we can see where the Eindhoven-trained experts of North American Philips will be in a position to build a major American electronics company for the good vehicles of A. W. Haydon Co. and a New York Stock Exchange listing. On December 1, 1954, Reynolds issued a Notice and Proxy Statement advising its shareholders of a special meeting to be held on December 28, 1954, for the purpose of obtaining shareholder approval for the (1) acquisition of the Haydon Division; (2) sale of assets to Stubnitz; (3) amendment of articles of incorporation to change the corporate name, enlarge corporate powers, and increase the number of authorized shares; and (4) to elect a new board of directors. Reynolds shareholders were advised that it was advantageous to leave the unprofitable automotive spring business and therefore negotiations had commenced in the spring of 1954 for "the *37 acquisition of operations or businesses in a field with a more expanding economic potential". On December 1, 1954, the date of the Notice and Proxy Statement, Reynolds stock sold at a high of $17.875 and a low of $17.25. The weekly highs and lows of Reynolds stock and the volume of trading in that stock on the New York Stock Exchange for the period March 5, 1954, through December 29, 1954, were as follows: Volume
Week ended
(Shares)
High
Low
Mar. 5
500
6
5 5/8
12
100
5 3/4
5 3/4
19
1,500
5 1/2
5 1/4
26
900
5 5/8
5 3/8
Apr. 2
600
5 1/4
5 1/8
9
2,000
5 3/8
5
16
2,200
6 1/8
5 1/2
23
1,100
6 3/8
5 3/4
30
2,200
6 1/2
5 3/4
May 7
900
6 1/2
6 1/4
14
700
6 1/4
6
21
900
6
5 3/4
28
2,300
6 1/8
5 1/2
June 4
6,200
7 1/8
6 3/8
11
1,900
7 3/8
6 3/8
18
1,600
7
6 1/2
25
2,300
7 1/4
6 7/8
July 2
16,900
8 7/8
7
9
1,900
8 3/8
7 7/8
16
2,700
8 1/2
8
23
1,600
8 3/8
8
30
11,000
9
8 1/4
Aug. 6
16,300
10 1/2
8 7/8
13
7,100
10 3/8
9 3/4
20
4,200
10
9 5/8
27
14,900
11 1/4
9 3/8
Sept. 3
21,300
11 7/8
9 3/4
10
2,000
10 3/8
10
17
14,700
11 1/2
10 1/2
24
9,100
11 1/2
11
Oct. 1
7,300
10 3/4
9 1/8
8
8,500
11 3/4
10 1/4
15
30,100
13
10 5/8
22
47,000
15 1/8
12 1/4
29
15,100
15 1/8
14 1/8
Nov. 5
9,000
15 1/8
14 1/8
12
37,700
18
15
19
12,600
17 1/2
16 3/4
26
10,600
17 5/8
16 7/8
Dec. 3
16,500
20 1/4
17 1/4
10
45,200
25
19 7/8
17
11,100
23 3/4
21 1/4
24
17,500
26 3/4
23 1/8
27
7,700
26 7/8
24 1/2
28
22,800
24 1/8
21 1/8
29
9,400
26 5/8
25
*38 The total number of Reynolds shares traded on the Exchange from April 2, 1954, through December 29, 1954, aggregated 456,100. Reynolds applied to the New York Stock Exchange for listing of the 279,000 shares to be issued to petitioner pursuant to the Sales Agreement. On December 27, 1954, the Exchange notified Reynolds that the application for listing would be rejected because what was to be essentially a new company did not meet the standards of the Exchange for an original listing. The next day, representatives of Reynolds and petitioner met with the chairman of the board, the president and other representatives of the New York Stock Exchange to appeal the rejection of the listing application. The staff of the Exchange was concerned with authorizing the listing of those shares which, if dumped on the market or sold on the market in large amounts, might adversely affect the value of the publicly held shares. The staff was aware of the increase in the market price of Reynolds stock over the preceding six months and believed that the listing could not be permitted unless the new shares were prohibited from coming on the market for a reasonable time, without the consent of the *39 Exchange. As a result of the December 28 meeting, the Exchange decided to approve listing of the additional 279,000 shares if petitioner would agree that it would not dispose of such shares for a period of three years without the consent of the Exchange. Petitioner agreed, whereupon the president of the Exchange stated that the listing would be recommended to the board of governors. The Exchange verbally advised petitioner of the form of a letter which petitioner would direct to the Exchange to evidence the agreed condition of listing. In connection with the foregoing condition, petitioner sent the following letter to the Exchange: December 28, 1954. Mr. G. K. Funston, President, New York Stock Exchange, 11 Wall Street, New York, N. Y. Dear Sir: In conjunction with the listing application of Consolidated Electronics Industries, Inc., dated December 28, 1954, this is to advise that North American Philips Company, Inc., for a period of three years from the date hereof, without the consent of the New York Stock Exchange, will not divest itself of its interest in Consolidated Electronics Industries, Inc. (name changed from Reynolds Spring Company) as at the time of closing to *40 be represented by the 279,000 shares of Common Stock of Consolidated Electronics Industries, Inc. to be issued pursuant to the agreement dated October 11, 1954, and which shares are the subject of such application for listing. Yours very truly, NORTH AMERICAN PHILIPS COMPANY, INC. R. G. DETTMER Secretary The Exchange did not require petitioner to place a legend on the certificates evidencing the 279,000 shares, to call attention to the above agreement. During the negotiations as to petitioner's commitment to the Exchange, there was no discussion of any exception for pledge or hypothecation of the Reynolds shares. On December 28, 1954, the Exchange approved the listing application submitted by Reynolds (dated December 28, 1954) in which listing was sought for the 279,000 shares designed for issuance to petitioner. On December 28, 1958, the shareholders of Reynolds ratified the Sales Agreement of October 11, 1954. At the meeting the shareholders also voted to change the name of the company to Consolidated Electronics Industries Corp. (For the purposes of this opinion, we will continue to refer to the company as "Reynolds.") On January 12, 1955, R. G. Dettmer, in his secretarial *41 capacity on behalf of both Reynolds and petitioner, sent two similar letters to Irving Trust Company, Reynolds' stock transfer agent, advising of the December 28 agreement with the Exchange, and requested that "all steps appropriate to your function as Transfer Agent [be taken] to assure that [petitioner] take no action contrary to its agreement * * * with the * * * Exchange." By letter dated February 2, 1955, Irving Trust Company advised petitioner as follows: Mr. R. B. Dettmer, Secretary, North American Philips Company, Inc., 100 East 42nd Street, New York 17, N. Y.
Dear Mr. Dettmer: You requested in your letter of January 12 that we, as transfer agent of the common stock of Consolidated Electronics Industries Corp., place stop transfer orders against certificates registered in the name of North American Philips Company, Inc. and numbered F-30284/30313 inclusive, aggregating 279,000 shares. You informed that the stops were to be placed in connection with an agreement with the New York Stock Exchange in respect of the listing application of Consolidated Electronics Industries Corp. dated December 28, 1954. Counsel have expressed doubt whether the stop transfer orders *42 would serve your purpose of preventing transfer of the shares, particularly if the certificates should be presented for transfer by an innocent purchaser for value and the restriction on their transfer is not stated on the certificate. It is their opinion that we, as transfer agent, could not delay unnecessarily the transfer of the certificates under such conditions. However, we have placed stop transfer orders against the certificates for the period ending December 27, 1957 in the belief that no request for transfer will be received. Should a transfer be presented, we will communicate promptly with all parties concerned, that is, North American Philips Company, Inc., Consolidated Electronics Industries Corp. and the New York Stock Exchange. With kind regards Sincerely yours, /s/ W. H. McCoach Assistant Vice President In its Federal income tax return for 1954, petitioner claimed a loss of $161,676.44 on the exchange of the Haydon Division for 279,000 shares of Reynolds stock. In the notice of deficiency, respondent increased petitioner's taxable income by $5,002,697.82 computed as follows: Fair market value of capital stock of
Consolidated Electronics
Industries Corp. (279,000 shares at $23.75 per
$6,626,250.00
share)
Less: Basis of property transferred in exchange
for
the aforementioned stock, other than the
capital
stock of the A. W. Haydon Company (1,500,000
minus $40,000)
$1,460,000.00
Basis of the 8,000 shares of the capital stock
of the
A. W. Haydon Company
201,676.44
Total basis of property transferred
$1,661,676.44
Legal fees
4,467.66
Total
1,666,144.10
Capital gain on the above indicated exchange
$4,960,105.90
Add: Capital loss claimed on return on sale of
the
capital stock of the A. W. Haydon Company, a
transaction whose result is reflected in the
fore-
going computation
$ 161,676.44
Less: Net capital loss, per return
119,084.52
Difference
42,591.92
Net long term capital gain
$5,002,697.82
*43 On December 29, 1954, the 279,000 shares of Reynolds stock which petitioner received had a fair market value of $8.08 per share. Opinion On December 29, 1954, petitioner exchanged the assets of the Haydon Division for 279,000 shares of Reynolds stock. Admittedly, this was a taxable transaction and the only question is whether the Reynolds stock had an ascertainable fair market value on the date of the exchange. Petitioner contends that the amount of gain or loss realized on the sale of its Haydon Division cannot be ascertained. Petitioner contends that the Reynolds stock which it received had no ascertainable fair market value because it was a speculative security and could not be disposed of for three years. To support its position petitioner relies on Helvering v. Tex-Penn Co. [37-1 USTC [*] 9194], 300 U.S. 481 (1937). Respondent contends that the Reynolds stock had an ascertainable fair market value. Respondent points out that on December 29, 1954, Reynolds stock was traded on the New York Stock Exchange at prices between $25 and $26.625 or an average of $25.81. In the notice of deficiency respondent determined that the Reynolds stock had a fair market *44 value of $23.75 per share. Respondent contends that this determination is in accord with the recognized principle that in the absence of clearly proven exceptional circumstances the prices at which shares of stock are traded on an open public market on the valuation date represents the best evidence of fair market value. Respondent contends that Helvering v. Tex-Penn Co., supra, is distinguishable from the instant case. Respondent contends that Reynolds was not a highly speculative company within the meaning of the Tex-Penn case and the sale of this stock was neither impossible nor improbable. We agree with respondent that the Reynolds stock had an ascertainable fair market value on December 29, 1954. It is well established that "fair market value" is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy and sell and both being informed of the material considerations. The question of fair market value is one of fact. In Tex-Penn Oil Co., 28 B.T.A. 917 (1933), which petitioner *45 relies upon, five individuals acquired thirtyone undeveloped oil and gas leases in 1917. In the spring of 1918, drilling for oil was begun and the first well completed in September 1918. On October 31, 1918, these individuals incorporated the Tex-Penn Oil Company. Tex-Penn continued to develop the aforementioned leases and by January of 1919, twelve wells had been drilled. The first well produced 600 barrels daily, the second 6,000, the third gas, the fourth gas, the fifth 100, the sixth 25, the seventh gas, the eighth 120, the ninth 130, the tenth 530, the eleventh 50, and the twelfth was dry. Early in 1919, the Tex-Penn shareholders decided to consolidate the Tex-Penn properties with various other oil-producing, refining and distributing facilities which they owned into a single company. After conferring with a group of bankers, on June 18, 1919, the Transcontinental Oil Company was incorporated with 2,000,000 shares of stock. The bankers agreed to purchase 500,000 shares of Transcontinental stock for $40 per share or $20,000,000. The bankers did not intend to keep the stock and subsequently formed a syndicate to resell the Transcontinental stock. Three of the five Tex-Penn shareholders *46 wanted cash for their shares because they wanted to get out of the venture. However, the other two shareholders, Benedum and Parriott, received 1,007,834 shares of Transcontinental stock. Prior to the issuance of the aforementioned stock, in order to prevent such shares from coming into the market during the operation of the syndicate, the bankers exacted from the two Tex-Penn shareholders an oral agreement that such shares would not be sold or disposed of in any way or under any conditions or circumstances during the life of the syndicate. Originally, the restriction was for 90 days but pursuant to an option, the restriction was extended an additional 90 days. By the time the restriction on sale ended, the venture proved to be a complete financial failure. The Board of Tax Appeals found that the exchange was a taxable transaction. In order to determine the amount of the gain it was necessary to determine the fair market value of the Transcontinental shares Benedum and Parriott received. At the time the Transcontinental shares were received, unrestricted shares were selling for approximately $48 per share on the New York Curb Exchange. Both parties called expert witnesses to testify. *47 Petitioner's witnesses were of the opinion that the stock had no fair market value. Although respondent determined in his notice of deficiency that the stock had a fair market value of $47.55, respondent's witnesses fixed the fair market value of the stock at about $12 per share if unrestricted and $10 per share subject to the restrictive agreement. The Board held that the restrictive agreement was voluntarily entered into and could not deprive the stock of a fair market value. The Board found that the fair market value of the stock was $7 per share. The Court of Appeals reversed the Board's decision, Tex-Penn Oil Co. v. Commissioner, 83 F. 2d 518 (C.A. 3, 1936), affd. 300 U.S. 481 (1937), and held the Transcontinental stock had no ascertainable fair market value. The Court stated its reasons at page 523: Transcontinental was a new company organized for the express purpose of developing new oil properties on a large scale. This was a very hazardous, speculative, and uncertain undertaking. The twelve wells which had been drilled were falling off and becoming definitely dry and profitless. The entire field which it was to develop was known to be "spotty". *48 This development proved to be an absolute failure, a great financial loss, and entirely worthless. Another thing increasing the hazards in this case and rendering more uncertain any guess as to the value of the stock on August 1, 1919, was the existence of a restrictive agreement wherein it was agreed that the recipients of the Transcontinental stock would not sell or dispose of it during the life, 90 days, of the bankers syndicate with the right in the syndicate to extend the restriction for another 90 days. The determination of the value of the stock on August 1, 1919, was a mere speculative guess and a three or six months' restriction on its sale makes the guess wilder and more speculative. The cases cited by the board on this point are inapplicable for the reason that the restrictive agreement here "did not come into existence as the result of any voluntary or cooperative action between Benedum, Parriott and Tex-Penn, but, on the contrary, the bankers, as a condition of financing the transaction, 'exacted from Benedum and Parriott' the agreement." Under these facts, to fix with any certainty any real value for this stock for income tax purposes on August 1, 1919, was impossible. *49 * * * The Supreme Court, Helvering v. Tex-Penn Co., supra, affirmed the Third Circuit. The Court stated at page 499: The court is also of opinion that the judgments must be affirmed upon the ground that in the peculiar circumstances of this case, the shares of Transcontinental stock, regard being had to their highly speculative quality and to the terms of a restrictive agreement making a sale thereof impossible, did not have a fair market value, capable of being ascertained with reasonable certainty, when they were acquired by the taxpayers. In the absence of such value, the ownership of the shares did not lay the basis for the computation of a gain at the time they were received, or for a tax as of that date under the applicable statute. § 202(b). Treasury Regulations 45, Art. 1563. The Supreme Court based its opinion, as did the Third Circuit, on two factors - the "highly speculative quality" of the stock and "the terms of a restrictive agreement making a sale thereof impossible." See Charles T. Kline, 44 B.T.A. 1052 (1941), affd. 130 F. 2d 742 (C.A. 3, 1942); Heiner v. Gwinner, 114 F. 2d 723 (C.A. 3, 1940), certiorari denied *50 311 U.S. 714 (1940). Thus, to prevail under Helvering v. Tex-Penn Co., supra, petitioner must establish the existence of both factors. Petitioner contends that the Reynolds stock was a speculative security on December 29, 1954. Petitioner points out that during the nine months between the commencement of negotiations between Reynolds and petitioner and consummation of the sales agreement, 456,100 shares were traded on the Exchange although only 280,000 were outstanding. In addition, petitioner urges, the only business of Reynolds on December 29, 1954, was the business of the Haydon Division, which was a relatively small operation involving custom design of small orders. Petitioner contends that most of that business was for end use by the United States and was therefore subject to renegotiation of profits and the vagaries of defense procurement. Petitioner maintains that most of the Haydon Division's earnings and sales were developed during a period of actual war and continued during a period of emergency. Petitioner contends that it was impossible to tell at the end of 1954 how long the emergency and the related sales would continue, just as it was impossible to tell *51 whether the oil lands involved in the Tex-Penn case would produce oil profitably. Developments in the electromechanical field, petitioner maintains, might have rendered the Haydon patents worthless and the Haydon products obsolete. Petitioner contends that in contrasting Reynolds with Tex-Penn, the fact that Tex-Penn failed whereas Reynolds did not fail is not the relevant fact in determining whether Reynolds was speculative enough to come within the Tex-Penn rule. Petitioner contends that the relevant fact is the possibility of a substantial drop in the quoted market price of the Reynolds stock, just as a similar possibility was present to a greater or lesser degree in the Tex-Penn case and those cases that followed it. Respondent contends that Reynolds was not a highly speculative company within the meaning of Helvering v. Tex-Penn Co., supra. Respondent maintains that the Haydon operation was established in 1945 and had been steadily growing. Respondent points out that the Haydon Division's earnings were annually increasing and it had a backlog of orders on August 31, 1954, of $2,115,000. Respondent also points out that Reynolds was acquiring the valuable Haydon patents, the *52 assistance of A. W. Haydon, and it would be able to utilize its Exchange listing in regard to its contemplated expansion. We agree with respondent. While it is true that the Reynolds stock may have been speculative, we do not regard it as the "highly speculative security" referred to in $ Helvering v. Tex-Penn Co., supra. Cf. Morris D. Kopple, 35 B.T.A. 1056 (1937); [1]Schuh Trading Co. v. Commissioner, 95 F. 2d 404 (C.A. 7, 1938); [2]State Street Trust Co. v. United States, 37 F. Supp. 846 (1941), affd. 124 F. 2d 948 (C.A. 1, 1942).[3]The Haydon Division was not a hazardous, speculative and uncertain undertaking. It was not a new company nor is there any indication that its management was inexperienced. There was no high degree of uncertainty as to its future. Its sales and earnings were continually increasing and it had a backlog of orders. *53 Having determined that the Reynolds stock was not "highly speculative" within the meaning of $ Helvering v. Tex-Penn Co., supra, we must consider the effect of the restriction on the sale of the Reynolds stock. Petitioner contends that the concept of fair market value presupposes a willing buyer and a willing seller. Petitioner contends that a restriction on sale destroys the validity of that presupposition because there cannot be either a willing buyer or a willing seller for something that cannot be sold. Petitioner contends that it was committed not to sell its 279,000 shares of Reynolds stock for a period of three years and therefore this destroyed the fair market value of the stock. If it had been impossible for petitioner to sell its Reynolds stock, we might agree with petitioner. Cf. Propper v. Commissioner, 89 F. 2d 617 (C.A. 2, 1937). [4] However, the agreement with the New York Stock Exchange was that petitioner would not dispose of the Reynolds stock for three years without the consent of the Exchange.
*54 The basis for the restriction was to stop the newly issued shares from being dumped on the market during a period of time when the company had not yet established itself and thereby maintain a proper price level for the other security holders. The Exchange feared that if any large block of stock came into the market, it would have an adverse effect upon the security value of other stockholders. In our view, the evidence fails to establish that the restriction imposed by the Exchange was such as to make sale of the Reynolds stock by petitioner either impossible or so improbable that it should be considered as impossible for practical purposes. Since the purpose of the restriction, insofar as the Exchange was concerned, was to protect the interest of stockholders from the effects of dumping, there is no reason to conclude from the evidence that a sale, under circumstances which safeguarded such interest, would not have been permitted. Moreover, if a sale were made without consent and "de-listing" by the Exchange followed, it seems likely that the market value would be affected thereby but this is not to say that such a sale could not be made. Thus, while the restrictions may have *55 limited the market and while the Exchange may well have imposed similar restrictions on a new owner in the event consent were granted, these are elements entering into the determination of what the fair market value of the stock is. Cf. Heiner v. Gwinner, supra. In the notice of deficiency respondent determined that the Reynolds stock had a fair market value of $23.75. We think that it is clear that this determination was erroneous. Over a period of nine months the Reynolds stock had risen from a low of $5 in April to a high of $26.625 in December 1954. The evidence establishes that a portion of this rise was due to Reynolds' anticipated association with Dutch Philips and petitioner. If petitioner sold its Reynolds stock, this anticipated association would be lost. We believe that respondent's determination failed to take this into account. Furthermore, we do not believe that his determination gave adequate consideration to the limited market petitioner might have for the Reynolds stock because of the restriction imposed by the Exchange. In addition, respondent's own two witnesses testified that the fair market value was substantially ( $16 to $18 per share and *56 $12.46 per share) below that determined in the notice of deficiency. Respondent called two witnesses to testify as to the fair market value of the Reynolds stock. An internal revenue employee testified that in his opinion the stock had a fair market value of $16 to $18 per share. We have given little weight to his testimony because it appears to have been based on little more than guess work and erroneous comparisons. The essence of his testimony was that he studied the price fluctuations before and after December 29, 1954, to determine whether there was a sound basis for the market price on that date. He then applied a rule of thumb discount to take into consideration the restriction. Without "trying to go into a too exact comparison with respect to every phase of the companies," the witness testified that he had made comparisons with the price earnings ratios of some "Electronics" company. Our consideration of these comparisons have led us to attach little significance to them. Respondent's other witness, a security analyst, testified that Reynolds stock had a fair market value of $12.46 per share. A partner in the mortgage banking firm of Morgan Stanley and Company was called *57 by petitioner and testified that the fair market value of the Reynolds stock was $5 per share. Both of these witnesses selected companies which they considered comparable to Reynolds and based their testimony on these comparisons. Neither selected a single company that the other considered comparable. After considering their testimony, the exhibits presented, and after taking into consideration the various objections to their valuation, we have concluded that the fair market value of the Reynolds stock on December 29, 1954, was $8.08 per share. Decision will be entered under Rule 50. Footnotes
1. In Morris D. Kopple the corporation under consideration was new. Although it was taking over established businesses, its future was uncertain. The corporation did not prosper. Its sales and earnings decreased and it had a substantial loss shortly after it began to do business. It discontinued business for several years and finally went into bankruptcy. ↩
2. In Schuh Trading Co. v. Commissioner the corporation was new, just starting on a plan of gathering some sixty odd wholesale drug companies scattered over the entire country. The company had no experience in the operation of such a business nor did its officers have any such experience. Its future was wholly unknown, its stock was unseasoned, and whether it would be of real value was a question wholly for the future. ↩
3. In State Street Trust Co. v. United States, International Hydro-Electric was a comparatively new enterprise; it was one of the top entities in a highly pyramided public utility holding company system; its Class A stock was subject to violent fluctuations; the Class A stock was junior to 83.3 percent of the stock of the entire holding company system; and the margin of earnings covering the Class A stock was very thin.↩
4. In that case, there was an agreement that the stock in question could not be transferred or disposed of for five years without the consent of certain bankers. The taxpayer tried to obtain the consent of the bankers to sell the stock but they refused. The taxpayer also tried unsuccessfully to sell the stock free of the restrictions. The stock was also refused as collateral for a loan.↩