HELVERING, COMMISSIONER OF INTERNAL
REVENUE, *v.* TEX-PENN OIL CO.*

No. 207. Argued December 14, 1936. Reargued February 1, 2,
1937.—Decided March 29, 1937.

---

* Together with No. 208, *Helvering, Commissioner,* v. *Benedum;*
and No. 209, *Helvering, Commissioner,* v. *Parriott.* Certiorari to
the Circuit Court of Appeals for the Third Circuit.

482

*Mr. Thurman Arnold,* with whom *Solicitor General Reed, Assistant Attorney General Jackson, Assistant Attorney General Morris,* and *Messrs. Sewall Key* and *A. F. Prescott* were on the brief, for petitioner.

*Mr. John W. Davis,* with whom *Messrs. Montgomery B. Angell, Weston Vernon, Jr., J. C. Adams, Harry Fried-*

*man, John S. Weller, John O. Wicks,* and *David D. Johnson* were on the brief, for respondents.

MR. JUSTICE BUTLER delivered the opinion of the Court.

In each of these cases there is involved an item claimed by petitioner to be taxable income of respondent for 1919. In 1925 the commissioner gave notice of deficiencies. These claims were based on a transaction in 1919 which included transfer by Tex-Penn Oil Company of all its assets to Transcontinental Oil Company, the issue and delivery by the latter of 1,007,834 shares to Benedum and Parriott, the stockholders of Tex-Penn, and the dissolution of that company. The commissioner claims that the consideration for the transfer included not only the stock but also $350,000 in cash paid by Transcontinental to Tex-Penn. Respondents petitioned the Board of Tax Appeals for redeterminations. The cases were consolidated for hearing; the board made findings of circumstantial facts on the basis of which it concluded in an "ultimate finding" that the consideration for the transfer by Tex-Penn to Transcontinental included cash, and that therefore the transaction was not one in which, under Revenue Act of 1918, § 202 (b), 40 Stat. 1060, "no gain or loss shall be deemed to occur." It redetermined deficiencies of $2,871,085, $1,925,466, and $908,470, respectively. 28 B. T. A. 917. Respondents petitioned the Circuit Court of Appeals for review. It reversed the orders with directions that the board enter judgments of no deficiencies. 83 F. (2d) 518.

1. The first ultimate finding is (p. 950): "The consideration received by Tex-Penn on or about August 1, 1919, in exchange for its assets consisted of $350,000 in cash and 1,007,834 shares of Transcontinental stock of no par value."

The first question for decision is whether that conclusion is supported by evidence. If well grounded, the transaction is not within the non-recognition of gain pro-

vision of § 202 (b). That section declares that "when in connection with the reorganization, merger or consolidation of a corporation a person receives in place of stock or securities owned by him new stock or securities of no greater aggregate par or face value, no gain or loss shall be deemed to occur from the exchange, and the new stock or securities received shall be treated as taking the place of the stock, securities, or property exchanged."

Treasury Regulations 45, Art. 1567,[1] contains an interpretation of that provision: "In general where two (or more) corporations unite their properties by . . . the sale of its property by B to A and the dissolution of B . . . no taxable income is received from the transaction . . . provided the sole consideration received by B and its stockholders . . . is stock . . . of A . . ."

The pertinent substance of the circumstantial facts found follows:

In 1917 and early 1918, respondents Benedum and Parriott and three others, Kirkland, Lantz and Wrather, acquired 31 Texas oil and gas leases called the "Duke-Knoles" group. The leases reserved to lessors a one-eighth royalty. The interests of the five in what the findings refer to as the remaining seven-eighths interest were Benedum six-sixteenths, Parriott and Kirkland three-sixteenths each, Lantz and Wrather two-sixteenths each.

---

[1] "In general, where two (or more) corporations unite their properties, by either (a) the dissolution of corporation B and the sale of its assets to corporation A, or (b) the sale of its property by B to A and the dissolution of B, or (c) the sale of the stock of B to A and the dissolution of B, or (d) the merger of B into A, or (e) the consolidation of the corporations, no taxable income is received from the transaction by A or B or the stockholders of either, provided the sole consideration received by B and its stockholders in (a), (b), (c), and (d) is stock or securities of A, and by A and B and their stockholders in (e) is stock or securities of the consolidated corporation, in any case of no greater aggregate par or face value than the old stock and securities surrendered. . . ."

In October, 1918, they caused Tex-Penn to be incorporated. Its authorized capital stock was $2,000,000, divided into 80,000 shares of $25 each. It issued 4,000 shares for par to the five lease owners ratably according to their interests; they transferred a fourth interest in the leases to the company. It agreed to develop the properties at its own expense; they agreed that one-half of their shares of the proceeds might be used to make up deficits in the company's operating expenses.

They authorized Parriott to receive their shares of the proceeds, to carry out the agreement with the company, and to invest the remaining half of the proceeds in the company's stock. Accounts of transactions between the company and him, as agent, were kept under the name of "Parriott Attorney." Pursuant to the agreement, he from time to time purchased at par stock of the company amounting to 9,120 shares; it used the money in developing the leased properties.

Benedum and Parriott were also interested as owners in the Riverside Eastern Oil Company, the Riverside Western Oil Company, and the Pittsburgh-Texas Oil & Gas Company. In early 1919, they decided to cause to be organized the Transcontinental Oil Company to acquire and operate the properties of these companies and of Tex-Penn together with the individually owned interests in the leases. Benedum's four associates, by writing dated June 2, 1919, gave him authority to sell the assets of Tex-Penn and all individual interests in the leases for $12,000,000 and agreed to accept their pro rata share of the net proceeds of the sale for their holdings in Tex-Penn and their individual interests in the leases.

To arrange for money with which to carry out the project, Benedum negotiated with bankers. Under the first plan, the bankers were to pay Transcontinental $23,000,000 for a part of its stock, and that amount was to be used to pay the $12,000,000, and $2,500,000 in equal parts to Riverside Eastern and Riverside Western to

486

retire preferred stock. The balance, $8,500,000, was to be retained by Transcontinental for working capital. By a later arrangement the amount to be paid by the bankers was reduced to $20,000,000 and that to be received by the five individuals to $9,000,000. Benedum's associates declined to accept less than their proportionate share of $12,000,000 as originally planned. In order that the undertaking should not fail, Benedum agreed to diminish by $3,000,000 the amount he was to have and so bore the entire reduction. On that basis, distribution of the $9,000,000 would be $1,500,000 each to Benedum, Lantz and Wrather and $2,250,000 each to Parriott and Kirkland.

Transcontinental was organized and authorized to issue 2,000,000 no-par-value shares, of which the bankers agreed to buy 500,000 at $40 per share. They exercised an option to buy 225,000 additional shares at $1.00 per share. Tex-Penn's assets were to pass to Transcontinental free and clear of all liabilities. July 12, Kirkland, Lantz and Wrather assigned and delivered their Tex-Penn shares to Benedum and Parriott for $30.[2]

---

[2] The terms of the transfers were evidenced by two letters to Parriott accompanying delivery of the assignments. Words within brackets were in the first letter but not in the second; words in italics were in the second letter but not in the first.

"In connection with the assignment we have executed today, transferring to . . . Transcontinental . . . all of our right, title and interest in the oil and gas leases. . . . we are assigning and hand you herewith our shares of stock . . . Tex-Penn . . . *which we hereby agree to sell to you and M. L. Benedum jointly for a consideration of $5.00 payable to each of us.* If for any reason the proposed organization of . . . Transcontinental . . . should not go through, this stock is to be returned to us.

"We understand that you and Mr. Benedum are transferring to . . . Transcontinental . . . a considerable amount of property that you and he own . . . including your interests in the Tex-Penn leases, and that you and he are to be paid for all these properties

July 15, the stock was transferred on the Tex-Penn stock book. July 22, new directors were elected to take the places of the assignors who, as stated in the minutes, had ceased to be stockholders.

July 14, the individual owners and Tex-Penn executed an assignment to Transcontinental of all their interest in the leases and gave it to Parriott in escrow for delivery upon payment of $5,250,000 to Kirkland, Lantz and Wrather, or to Parriott for their account. They stipulated that if payment was not made by August 1, the assignment and stock would be returned to them. And, in order that Tex-Penn assets might be free from liability, they authorized Parriott to deduct from their shares seven-sixteenths of not exceeding $500,000 to pay debts and obligations of the company. Benedum and Parriott were to bear nine-sixteenths. The auditor of Tex-Penn reported that approximately $350,000 would be required.

July 24, Benedum and Parriott made a contract with J. M. Holliday, acting for the bankers and Transcontinental, in which they agreed to transfer to Transcontinental their interests in the leases for $3,400,000 in cash, to cause Tex-Penn to transfer to Transcontinental all its assets "for and in consideration of . . . $350,000 in cash and . . . 1,007,834 shares of the capital stock of . . . Transcontinental," and to cause Kirkland, Lantz and Wrather to transfer to Transcontinental their seven-sixteenths of the five-eighths interest in the leases for $5,250,000 in cash.

The same day, Holliday addressed an offer to Tex-Penn to purchase all its assets "for . . . $350,000 in cash

partly in cash and partly in stock of . . . Transcontinental. . . . Our entire interests in the stock of the Tex-Penn Company and in the leases covered by the assignment above referred to are paid for in full by the [$5,250,000 that is to be paid us in this transaction.] *considerations agreed upon between us.*"

and . . . 1,007,834 shares" of Transcontinental. By resolution of its directors, Tex-Penn accepted the offer, referring to the consideration as "$350,000 cash and . . . 1,007,834 shares" of Transcontinental. It was further resolved that, after the transfer of its property, the collection of debts due, and payment of those owed by, Tex-Penn, it would be dissolved and its assets distributed to its stockholders "and that to facilitate this, the . . . officers . . . direct Mr. Holliday that . . . $350,000 . . . shall be paid to the treasury of this company, and that the . . . shares . . . be issued and delivered to" Benedum and Parriott jointly.

July 30, Tex-Penn conveyed its assets to Transcontinental. Holliday directed the latter to deliver to Benedum and Parriott jointly certificates for 1,007,834 shares, to deliver $5,250,000 to Parriott Attorney, $3,400,000 to Benedum and Parriott and $350,000 to Tex-Penn. The next day, these directions were carried out by Transcontinental.

There was available for use by Tex-Penn in payment of its expenses $286,891.29, derived from one-half of the proceeds from the individually owned five-eighths interest in the leases. It also had receivables and oil and the $350,000 with which to discharge its liabilities. The $350,000 was deducted by Transcontinental from the amount to be paid Benedum and Parriott for their interest in the leases. But that deduction was in fact borne not by them alone but ratably by the five owners. Payment of Tex-Penn's liabilities did not require use of all the $350,000. There remained $55,255.24. And that sum was distributed to the five individuals according to their interests in the leases.

Details are reflected in the accounts of "Parriott Attorney." Kirkland was given credit for $2,250,000 and Lantz and Wrather for $1,500,000 each as purchase prices of their shares of the five-eighths interest in the leases.

Each of the five, according to his interest in the leases, was charged with his share of the $350,000 with the explanation that "this amount was to be apportioned against the sale price received by all the individual interests." [3]

In respect of the transfer of the Tex-Penn stock by Kirkland, Lantz and Wrather to Benedum and Parriott, the latter were charged $15 each and correspondingly each of the former was credited with $10. At the end of the year, Parriott furnished annual statements to Kirkland, Lantz and Wrather, showing the sale prices of their interests in the leases reduced by their contributions to the $350,000. The sales price of the stock sold by them was shown at $30.

---

[3] This corrected an entry of August 1 which charged Tex-Penn with the $350,000 and credited $140,000 to Benedum and $210,000 to Parriott with the explanation that the $350,000 had been taken out of their share of the purchase price of the Duke-Knoles properties. The correcting entry (December 31, 1919) is as follows:

| | |
|---|---|
| W. E. Wrather | $43,750.00 |
| J. B. Lantz | 43,750.00 |
| J. L. Kirkland | 65,625.00 |
| F. B. Parriott | 65,625.00 |
| M. L. Benedum | 131,250.00 |
| Tex-Penn Oil Co | $350,000.00 |

To correct . . . entry . . . distributing amount paid by [sic] Tex-Penn by Transcontinental . . . and deducted from M. L. B. (Benedum) and F. B. P. (Parriott) cash proceeds of sale of Duke-Knoles property to Transcontinental . . . as this amount was to be apportioned against the sale price received by all the individual interests reducing such sale price of 5/8 int. per agreement to following:

| | |
|---|---|
| W. E. Wrather | $1,456,250.00 |
| J. B. Lantz | 1,456,250.00 |
| J. L. Kirkland | 2,184,375.00 |
| F. B. Parriott | 2,184,375.00 |
| M. L. Benedum | 1,368,750.00 |
| Total | $8,650,000.00 |

On partial distributions by Parriott before final settlement, Kirkland, Lantz and Wrather gave receipts similar in form. That of Kirkland recited that the payment was on account of the purchase price of his interest "in and to . . . the leases . . . and to the stock of the Tex-Penn. . . . The balance . . . is to be retained until the final adjustment of the taxes and the affairs of . . . Tex-Penn . . . at the conclusion of which the said balance is to be paid to me, less my proportionate share of said expenses." Kirkland and Lantz died before the hearing. Wrather testified that he attached no great importance to the form of the receipt; that he knew there had been in form separate transfers of the lease interests and the Tex-Penn stock but that he and his associates considered only the ultimate objective.

Benedum and Parriott in their 1919 income tax returns reported their own profits from the sale of their lease interests upon the basis of the total price of $8,650,000. Tex-Penn's return stated that it had sold its assets for $350,000 cash and shares of stock. It also stated that the cost of the assets sold was $2,359,205.69, from which it deducted $350,000, leaving $2,009,205.69, and that amount was designated "value of stock." Neither the $350,000 nor the stated "value of stock" received was included in gross income. A schedule attached to the return stated that the cash consideration was accounted for in the return, and that the "no par value stock" received was not taxable income under § 202 (b) and T. D. 2924.

The foregoing includes the substance of all the findings of circumstantial facts material to the question under consideration. They must be taken as established if supported by substantial evidence. *Helvering* v. *Rankin*, 295 U. S. 123, 131. *Old Mission Cement Co.* v. *Helvering*, 293 U. S. 289, 294. *Burnet* v. *Leininger*, 285 U. S. 136, 138–139. *Phillips* v. *Commissioner*, 283 U. S.

589, 600. *Old Colony Trust Co.* v. *Commissioner*, 279 U. S. 716. There is no suggestion that they are not amply sustained. In addition to and presumably upon the basis of these findings, the board made its "ultimate finding." And upon that determination it ruled that the transaction was not within the non-recognition provisions of § 202 (b). The ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact. It is to be distinguished from the findings of primary, evidentiary or circumstantial facts. It is subject to judicial review and, on such review, the court may substitute its judgment for that of the board. *Helvering* v. *Rankin, ubi supra.*

Treating the transaction as a part of reorganization, merger or consolidation, the board concluded that cash constituted a part of the consideration. The opinion refers to writings above mentioned and emphasizes their provisions that state or indicate that the consideration was or did include cash and stock. The documents cited are the agreement for the transfer of Tex-Penn's assets to Transcontinental, the offer to Tex-Penn, the resolution of its directors accepting the offer and directing payment of the $350,000 to its treasury. Holliday's letter directing Transcontinental so to pay, Transcontinental's check for that amount to Tex-Penn and the latter's tax return.

But the board's findings of what was actually done show that, pursuant to direction of the individuals selling lease interests, Transcontinental advanced to Tex-Penn $350,000 and deducted that amount from the price of the lease interests. The findings also show that, for the part of that amount remaining after payment of its debts, Tex-Penn accounted to the individuals.

As indirectly showing that the $350,000 constituted part of the consideration for transfer of Tex-Penn assets, the opinion cites the entry in the "Parriott Attorney" accounts showing that the effect of the payment of that

sum to Tex-Penn was to reduce the sale price of the interest in the leases from $9,000,000 to $8,650,000, the entries distributing that amount to the five individuals, and the tax returns of Benedum, Parriott and Tex-Penn.

Petitioner does not bring forward these entries or the tax returns of Benedum and Parriott to support the board's ultimate finding now under consideration. Manifestly, the entries referred to in the board's opinion are opposed to its conclusion. As will more fully appear, upon an examination of them later to be made, the findings of details make it plain that the $350,000 was a part of the consideration paid for the individually owned lease interests and leave no ground for any other inference.

The board's opinion shows that both parties relied on art. 1567 as a correct interpretation of the statute. The board held (p. 959) that it "requires, as a condition of nonrecognition of gain, that the sole consideration be stock or securities . . . The written agreements herein indicate clearly that there was a cash consideration to Tex-Penn of $350,000. We are not convinced by the oral evidence that that was not a fact. Accordingly, we hold that the petitioners have not brought themselves within section 202 (b) . . . and article 1567 . . . so as to escape recognition of gain."

The opinion of the Circuit Court of Appeals, after discussion of primary or evidentiary facts found by the board, states, 83 F. (2d) at p. 522: "A consideration of all the documentary evidence drives us to the conclusion that the $350,000 was not consideration passing from Transcontinental to Tex-Penn, but was money furnished by the lessees as individuals to pay the debts of Tex-Penn so that the transaction might be made according to agreement . . . In form the documents upon which the Board of Tax Appeals relied stated that the $350,000 was corporate consideration passing from Transcontinental, but in fact, it was not, and the rule is well settled that in determining tax liability, taxing authorities must

look through form to fact and substance. It has been a long time since these transactions took place and most of the parties who were interested in them are dead, but every living person who was in any way connected with them testified without contradiction that the $350,000 was paid by the five lessees and not by Transcontinental."

The validity of the ultimate finding above quoted is to be tested by what in fact was done rather than by the mere form of words used in the writings employed. *United States* v. *Phellis*, 257 U. S. 156, 168. *Curran* v. *Commissioner,* 49 F. (2d) 129, 131. The board's findings of circumstantial facts definitely show the substance of the transaction as actually consummated. Summarily stated, the details of controlling significance are these:

The bankers bought from Transcontinental 725,000 shares of its stock for $20,225,000. Transcontinental paid and issued its stock:

|  | Cash | Shares |
|---|---|---|
| Riverside Eastern........ | $1, 250, 000 | 41, 666 |
| Riverside Western........ | 1, 250, 000 | 41, 667 |
| Pittsburg-Texas.......... | ......... | 158, 833 |
| Benedum and Parriott.... | 3, 400, 000 | 1, 007, 834 |
| Parriott, Attorney........ | 5, 250, 000 | ......... |
| Tex-Penn ............... | 350, 000 | ......... |
|  | $11, 500, 000 | 1, 250, 000 |

Included in the total was $9,000,000 to pay for the individually owned five-eighths interest in the leases and $2,500,000 to retire preferred stock of Riverside Eastern and Riverside Western, and $5,250,000 to pay for seven-sixteenths of the five-eighths interest: $2,250,000 to Kirkland and $1,500,000 each to Lantz and Wrather. The remaining $3,750,000 was to pay Benedum and Parriott for their nine-sixteenths: $1,500,000 to Benedum for his six-sixteenths and $2,250,000 to Parriott for his three-sixteenths.

The $350,000 received by Tex-Penn from Transcontinental was to be used to the extent needed to pay Tex-

Penn's debts in order that its assets should be free and clear of liabilities. But no part of that amount was borne by Transcontinental. Upon authorization of Benedum and Parriott, it deducted that amount from the $3,750,-000 payable by it to them. And, by arrangement among themselves, the five individuals were chargeable with the $350,000 according to their interests in the leases:

| | |
|---|---:|
| Benedum................................ | $131, 250 |
| Parriott................................ | 65, 625 |
| Kirkland................................ | 65, 625 |
| Lantz.................................. | 43, 750 |
| Wrather ............................... | 43, 750 |
| | $350, 000 |

The amount so advanced exceeded what was required to pay Tex-Penn's debts by $55,255.24. And to the five individuals that amount was accounted for:

| | |
|---|---:|
| Benedum.............................. | $20, 720. 73 |
| Parriott.............................. | 10, 360. 35 |
| Kirkland............................. | 10, 360. 35 |
| Lantz................................ | 6, 906. 90 |
| Wrather ............................. | 6, 906. 90 |
| | $55, 255. 23 |

The statement below shows in column (1) the amounts that, but for the advance of $350,000 to Tex-Penn, each of the individuals would have received directly from Transcontinental in cash for his interest in the leases; it shows in column (2) the amount that was received by each after deducting his share of the amount actually used to discharge liabilities of Tex-Penn.

| | (1) | (2) |
|---|---:|---:|
| Benedum............. | $1, 500, 000 | $1, 389, 470. 73 |
| Parriott............. | 2, 250, 000 | 2, 194, 735. 35 |
| Kirkland............. | 2, 250, 000 | 2, 194, 735. 35 |
| Lantz............... | 1, 500, 000 | 1, 463, 156. 90 |
| Wrather ............. | 1, 500, 000 | 1, 463, 156. 90 |
| | $9, 000, 000 | $8, 705, 255. 23 |

The board's findings of evidentiary details not only fail to support, but definitely negative, its conclusion that the consideration received by Tex-Penn in exchange for its assets included $350,000 in cash.

Essential to the project was the transfer to Transcontinental of Tex-Penn assets free from claims, and equally indispensable was the transfer of the individually owned lease interests. Tex-Penn needed money to satisfy demands of its creditors. Should it be unable to free its property from liability, the entire enterprise might fail. In that event, the individuals would lose the sale of their lease interests. And so, they decided to provide the cash needed by Tex-Penn to clear its assets and for that purpose they caused Transcontinental to advance Tex-Penn the $350,000 and deduct it from $9,000,000, the price it was to pay them for their lease interests. The excess, $55,255.24, was ratably distributed as shown above. No part of the $350,000 was included in or had any relation to the consideration for the transfer of the Tex-Penn assets. In legal effect, the details found by the board to have been carried out are not to be distinguished from a direct advance by the five individuals to Tex-Penn of the money required to pay its debts. Unquestionably, such an advance would not constitute consideration received by Tex-Penn. As against the board's findings showing what was actually done in consummation of the transaction, no weight as evidence can be given to mere recitals, directions, engagements and admissions of respondents contained in the documents relied on by the board. It should have held that the Transcontinental stock was the sole consideration for the transfer of the Tex-Penn assets. The Circuit Court of Appeals rightly held that the ruling to the contrary was erroneous.

2. The board's second ultimate finding is (p. 950). "The cash received by Wrather, Lantz and Kirkland from Transcontinental was consideration for both their

stock in Tex-Penn and their interests in the Duke-Knoles leases." The board (p. 959) deemed that conclusion an additional ground for its ruling that the transaction is not within the non-recognition provisions of § 202 (b). In support of that view the commissioner maintains that "the nominal sale of stock, the transfer of the assets of Tex-Penn, and the sale of the individual interests in the leases, constituted a single indivisible transaction."

But the circumstantial facts clearly negative this ultimate finding. Kirkland, Lantz and Wrather sold their Tex-Penn stock to Benedum and Parriott and their lease interests to Transcontinental. The stock was sold and delivered before the assignment of the lease interests was made. The transfer on the company's stock book was effected, and their connection as stockholders and directors was terminated, while the lease interests were being held until paid for by Transcontinental. The stipulation that, if payment for their lease interests was not made by August 1, the assignment of their shares of stock would be returned, did not make the two sales a single or indivisible transaction. Assuming that Kirkland, Lantz and Wrather would not have sold their Tex-Penn stock without also selling their lease interests, that fact would not convert the two sales into one. The purpose of the stipulation is plain. If Transcontinental did not pay for and take the lease interests and Tex-Penn continued to operate the properties, they would again become stockholders and have a voice in the operation.

On the point under consideration, the commissioner's position before the board is not in harmony with his contention here. There he made four computations: two were of Tex-Penn taxes, the other two were respectively those of the other respondents. In all his calculations, he attributed to the consideration for Tex-Penn assets the 1,007,834 shares of Transcontinental and to the

Benedum and Parriott lease interests their shares of the cash, $9,000,000, less the amount thereof used to pay Tex-Penn debts. All these shares went to Benedum and Parriott who owned all the Tex-Penn stock. The deficiencies claimed by the commissioner and the amounts determined by the board rest upon the fact that Benedum and Parriott as the only stockholders of Tex-Penn became the owners of the 1,007,834 Transcontinental shares. And, as shown by the board's findings, the balance of the cash without more went to Kirkland, Lantz and Wrather for their lease interests.

It is immaterial whether $30 was sufficient fully to compensate them for their Tex-Penn stock. The findings show the transfer was valid. Invalidating disparity between worth and consideration is not disclosed, and may not be assumed. Indeed, the commissioner's brief states that Tex-Penn was organized to develop the leases which were the personal property of its five stockholders; it "was not expected to operate at a profit . . . and actually it could not operate at a profit . . . It was useful chiefly in connection with the five-eighths royalties in the Duke-Knoles field held individually by its stockholders." And respondents call attention to findings disclosing operating results that point in the same direction.

We find nothing in the circumstantial facts found or in the evidence to support the board's conclusion that Kirkland, Lantz and Wrather received from Transcontinental any cash for their stock in Tex-Penn. It cannot be sustained.

3. The commissioner seeks reversal upon the grounds that the transaction was not a tax-exempt reorganization because Tex-Penn sought to realize a profit rather than merely to change the form of its ownership and that § 202 (b) does not exempt from taxation exchanges of property for stock. Specifically he argues that, assuming that the Transcontinental stock was the sole

property exchanged for Tex-Penn assets, the transaction was not within the non-recognition of gains provision. Concededly, this contention is contrary to the interpretation put upon § 202 (b) by art. 1567 which was promulgated September 26, 1919 by the commissioner with the approval of the Secretary of the Treasury and has since been followed.[4] The parties presented their respective claims to the board and to the lower court on the theory that, if neither Tex-Penn nor its stockholders as such received any cash from Transcontinental, the transaction would be within § 202 (b). The commissioner's notices of deficiency do not suggest the construction for which he now contends. He sought no ruling upon the question from the board or the lower court and is therefore not entitled to have it decided here. *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378, 380. The taxpayers were entitled to know the basis of law and fact on which the commissioner sought to sustain the deficiencies. His failure earlier to present the question leaves this court without the assistance of decision below.[5] His petitions for these writs did not present the question to this court. We are not called on to consider the construction of § 202 (b) now proposed.[6]

---

[4] Cf. *Brewster* v. *Gage,* 280 U. S. 327, 336. *Fawcus Machine Co.* v. *United States,* 282 U. S. 375, 378. *Federal Land Bank* v. *Warner,* 292 U. S. 53, 55.

[5] Cf.*Virginian Ry.* v. *United States,* 272 U. S. 658, 675. *Lawrence* v. *St. Louis-San Francisco Ry.,* 274 U. S. 588, 596. *Hammond* v. *Schappi Bus Line,* 275 U. S. 164, 171–172. *Baltimore & Ohio R. Co.* v. *United States,* 279 U. S. 781, 787. *Beaumont, S. L. & W. Ry.* v. *United States,* 282 U. S. 74, 86. *Public Service Comm'n* v. *Wisconsin Telephone Co.,* 289 U. S. 67, 69–70.

[6] *Alice State Bank* v. *Houston Pasture Co.,* 247 U. S. 240, 242. *Webster Co.* v. *Splitdorf Co.,* 264 U. S. 463, 464. *Steele* v. *Drummond,* 275 U. S. 199, 203. *Gunning* v. *Cooley,* 291 U. S. 90, 98. *Johnson* v. *Manhattan Ry. Co.,* 289 U. S. 479, 494. *Zellerbach Paper Co.* v. *Helvering,* 293 U. S. 172, 182. *Helvering* v. *Taylor,* 293 U. S.

4. As the sole consideration to Tex-Penn was Transcontinental shares and as Kirkland, Lantz and Wrather received from Transcontinental no cash for their Tex-Penn stock, the transaction is within the non-recognition of gains provisions. The judgments must therefore be affirmed.

5. The court is also of opinion that the judgments must be affirmed upon the ground that in the peculiar circumstances of this case, the shares of Transcontinental stock, regard being had to their highly speculative quality and to the terms of a restrictive agreement making a sale thereof impossible, did not have a fair market value, capable of being ascertained with reasonable certainty, when they were acquired by the taxpayers.

In the absence of such value, the ownership of the shares did not lay the basis for the computation of a gain at the time they were received, or for a tax as of that date under the applicable statute. § 202 (b). Treasury Regulations 45, Art. 1563.

*Affirmed.*

MR. JUSTICE ROBERTS took no part in the consideration or decision of these cases.

MR. JUSTICE CARDOZO concurs on the ground last stated in the opinion.

507, 511.   *Clark* v. *Williard*, 294 U. S. 211, 216.   *Morehead* v. *N. Y. ex rel. Tipaldo*, 298 U. S. 587, 605.