IN THE SUPREME COURT OF NORTH CAROLINA

No. 303A19

Filed 17 July 2020

IN THE MATTER OF: N.G.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 15 May 2019 by Judge J.H. Corpening II in District Court, New Hanover County. This matter was calendared for argument in the Supreme Court on 19 June 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Karen F. Richards for petitioner-appellee New Hanover County Department of Social Services.*
>
> *N.C. Administrative Office of the Courts, Guardian ad Litem Division, by Michelle FormyDuval Lynch, Staff Attorney, for appellee Guardian ad Litem.*
>
> *Sydney Batch for respondent-appellant mother.*
>
> *Jeffrey L. Miller for respondent-appellant father.*

HUDSON, Justice.

Respondents appeal from the trial court's order terminating their parental rights to N.G. (Natasha).[1] After careful review, we affirm.

---

[1] The minor child N.G. will be referred to throughout this opinion as "Natasha," which is a pseudonym used to protect the identity of the child and for ease of reading.

Factual and Procedural Background

On 15 February 2017, the New Hanover County Department of Social Services (DSS) filed a juvenile petition alleging that Natasha was a neglected and dependent juvenile. DSS claimed that respondent-mother was "chronically homeless" and suffered from untreated mental health conditions. DSS asserted that respondent-mother's homelessness had contributed to Natasha being "excessively" tardy and absent from school and that it was affecting Natasha's school performance. DSS further alleged that respondent-father had provided care for Natasha in the past but was currently prevented from doing so due to respondent-mother's actions. DSS obtained nonsecure custody of Natasha and placed her with respondent-father.

On 20 February 2017, the trial court held a second seven-day custody hearing. At that time, DSS advised the trial court that (1) respondent-father had misled DSS as to his correct name and date of birth, and (2) respondent-father was a party in an active termination of parental rights case that was on appeal. The trial court removed Natasha from her placement with respondent-father and placed her in foster care.

On 13 April 2017 and 25 May 2017, DSS filed amended juvenile petitions that added additional allegations concerning respondent-father. DSS claimed that respondent-father was not suitable for placement because he had mental health issues and had his parental rights terminated as to another child. DSS alleged that his diagnosis of antisocial personality disorder prevented him from providing a safe

home for Natasha. DSS again alleged that respondent-father had actively misled DSS as to his identity prior to the filing of the original juvenile petition.

On 31 July 2017, the trial court adjudicated Natasha a dependent juvenile after respondents stipulated to the allegations in the juvenile petition. DSS voluntarily dismissed the allegation of neglect. The trial court determined that pursuant to N.C.G.S. § 7B-901(c)(2), reunification efforts with respondent-father were not required because he previously had his parental rights to another child involuntarily terminated. The trial court ordered that custody of Natasha would remain with DSS and that the permanent plan should be reunification with respondent-mother. The trial court further ordered respondent-mother to complete a case plan that required her to establish stable housing and income and complete a mental health assessment and follow all recommendations. Both respondents were granted visitation.

The trial court held a review hearing on 13 September 2017. At the review hearing, respondent-father requested temporary placement of Natasha and expanded visitation. Respondent-father testified, however, that he did not want legal custody of Natasha because he wanted respondent-mother to have legal custody. The trial court found as a fact that respondent-father had bought Natasha clothes and school supplies and furnished her with a telephone. The trial court made no changes in custody and ordered that the permanent plan for Natasha should continue to be reunification with respondent-mother.

A permanency planning review hearing was held on 7 February 2018. In an order entered on 15 March 2018, the trial court found that respondent-father had not been forthcoming with identifying information and had failed to acknowledge previous concerns regarding DSS involvement. Respondent-father requested that the trial court consider ordering DSS to work toward reunification efforts with him. He stated that he was willing to pay for another evaluation from Dr. Len Lecci who performed a psychological evaluation of respondent-father in his other termination of parental rights case involving a sibling of Natasha's in 2014. Further, he requested additional visitation with Natasha. The trial court found, however, that respondent-father was not making progress towards a plan of reunification and had not provided evidence that he had engaged in necessary services on his own. The trial court ordered that a concurrent plan of adoption be added for Natasha.

Following a subsequent permanency planning hearing held on 30 August 2018, the trial court modified the permanent plan for Natasha to adoption with a concurrent plan of reunification. The trial court found that respondent-father had presented no evidence that he had engaged in services to address his untreated mental health issues and had consistently failed to acknowledge the concerns his mental health issues would raise regarding his ability to care for Natasha. The trial court found as a fact that there was a poor prognosis for change based on respondent-father's psychological evaluation. The trial court further found that respondent-mother had failed to attend individual therapy as recommended and that a

psychological evaluation revealed that she exhibited a personality pattern profile associated with paranoid and narcissistic personality disorders. It was noted that individuals with diagnoses such as respondent-mother's are often resistant to treatment and have difficulty forming therapeutic relationships. Additionally, the trial court found that respondent-mother had failed to secure permanent stable housing and was participating in her case plan to a minimal degree.

A subsequent permanency planning hearing was held on 7 February 2019. In an order entered on 18 March 2019, the trial court found that neither parent was making adequate progress toward reunification and that adoption should be pursued. The trial court ordered DSS to pursue termination of respondents' parental rights.

On 14 December 2018, DSS filed a petition to terminate respondents' parental rights. DSS alleged grounds to terminate respondent-mother's parental rights to Natasha based on neglect, willful failure to make reasonable progress, and dependency. *See* N.C.G.S. § 7B-1111(a)(1), (2), and (6) (2019). DSS alleged grounds to terminate respondent-father's parental rights to Natasha based on neglect, willful failure to make reasonable progress, failure to legitimize, willful abandonment, and the fact that his parental rights with respect to another child had been terminated involuntarily and he lacked the ability or willingness to establish a safe home. *See* N.C.G.S. § 7B-1111(a)(1), (2), (5), (7), and (9).

On 15 May 2019, the trial court entered an order concluding that grounds existed to terminate respondents' parental rights. The trial court found that grounds

existed pursuant to N.C.G.S. § 7B-1111(a)(1) and (2) to terminate both respondents' parental rights, and that additional grounds existed to terminate respondent-father's parental rights pursuant to N.C.G.S. § 7B-1111(a)(5), (7), and (9). The trial court dismissed the allegation of dependency as to respondent-mother. The trial court further concluded that termination of respondents' parental rights was in Natasha's best interests. Accordingly, the trial court terminated their parental rights. Respondents appealed.

<u>Analysis</u>

A termination of parental rights proceeding consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019); *In re Montgomery*, 311 N.C. 101, 110, 316 S.E.2d 246, 252 (1984). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of one or more grounds for termination under subsection 7B-1111(a) of our General Statutes. N.C.G.S. § 7B-1109(f). We review a trial court's adjudication "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. at 111, 316 S.E.2d at 253 (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982)). If the petitioner meets its burden during the adjudicatory stage, "the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835,

842, 788 S.E.2d 162, 167 (2016) (citing *In re Young*, 346 N.C. 244, 247, 485 S.E.2d 612, 614–15 (1997); N.C.G.S. § 7B-1110).

I.     Respondent-Father

Respondent-father challenges the multiple grounds found by the trial court to terminate his parental rights. We first consider respondent-father's argument that the trial court erred by concluding that grounds existed pursuant to N.C.G.S. § 7B-1111(a)(9) to terminate his parental rights. N.C.G.S. § 7B-1111(a)(9) provides for termination of parental rights where "[t]he parental rights of the parent with respect to another child of the parent have been terminated involuntarily by a court of competent jurisdiction and the parent lacks the ability or willingness to establish a safe home." N.C.G.S. § 7B-1111(a)(9). "A 'safe home' is defined by the Juvenile Code as one 'in which the juvenile is not at substantial risk of physical or emotional abuse or neglect.' " *In re T.N.H.*, 372 N.C. 403, 412, 831 S.E.2d 54, 61 (2019) (quoting N.C.G.S. § 7B-101(19) (2017)).

Here, the trial court made the following findings of fact relevant to its adjudication of grounds to terminate respondent-father's parental rights under N.C.G.S. § 7B-1111(a)(9):

> 11.    That Ms. Sullivan spoke to Respondent-Father about the concerns with Respondent-Mother's care for the Juvenile and Respondent-Father did not intervene. Respondent-Mother had placed the Juvenile with Respondent-Father prior to [DSS's] involvement and allowed the Respondent-Mother to take the Juvenile back into her care prior to [DSS's] involvement.

12.     That when the Juvenile came into care, Respondent-Father was explored for placement. Respondent-Father provided [DSS] with a different last name and birth date than his own and that fictitious information was used for system checks to determine if he was a proper placement. Based on the fictitious information, the Juvenile was placed with Respondent-Father. At the initial seven-day hearing, concerns about Respondent-Father's identity were expressed and [DSS] learned Respondent-Father's correct name and date of birth. The appropriate record checks were completed and revealed that he had a prior Child Protective Services history with [DSS] and his rights to another of his children were involuntarily terminated. The Juvenile was removed from his placement after one night with Respondent-Father and placed in the same foster home as her sibling. Respondent-Father admits that he was untruthful with [DSS], and went along with it while knowing he was doing wrong.

. . . .

15.     That [DSS] did not enter into a case plan with Respondent-Father. All efforts towards reunification with him were ceased at the Adjudication and Disposition Hearing on June 26, 2017. The Respondent-Father stipulated, in part, that his parental rights were terminated to another child.

16.     That Respondent-Father had a case plan in New Hanover County Case Number 14 JA 84, and his rights to that child were terminated in New Hanover County Case Number 14 JT 84, In the Matter of [I.S.D.], entered February 3, 2016. . . .

. . . .

23.     That Dr. Len Lecci previously evaluated Respondent-Father for his 2014 case involving a sibling to this Juvenile. [DSS] moved to introduce into evidence as *Petitioner's Exhibit "4"*, Dr. Lecci's CV, and *Petitioner's*

*Exhibit "5"*, Respondent-Father's Psychological Evaluation dated November 5, 2014 with addendum dated January 7, 2015. No party present objected and said exhibits were received into evidence. It was stipulated by all parties that Dr. Lecci was qualified as an expert in clinical psychology and parental competency.

24. That Dr. Lecci diagnosed Respondent-Father with Antisocial Personality Disorder. This diagnosis came from a compilation of Respondent-Father's clinical interview, diagnostic/standardized tests, and collateral information. Most of the tests have built in measures to determine lying and defensiveness. Respondent-Father was elevated on all measures which is text book grossly underreporting. While Respondent-Father does not have cognitive issues to parent, his had the highest elevation on the L scale which is for lying. He was elevated for the defensiveness score as well as his superlative score. Elevations of these scores are problematic as the client may be aware that he is lying and providing "Pollyanna" responses. A client with these scores may have no sense of other people's distress or grossly underreporting about a situation. Initially, Dr. Lecci's diagnosis was limited due to Respondent-Father's extreme defensiveness, but Dr. Lecci did include Cannabis abuse, in partial remission, and Antisocial Personality Disorder remains to be ruled out but could be confirmed with some collateral information. Dr. Lecci opined that if an Antisocial Personality Disorder was an accurate diagnosis, then continued and longstanding dishonesty would be expected, and any adaptive change in the near future is unlikely. Short term interactions with a person with Antisocial Personality Disorder would have that person presenting favorably, be likeable and consistent with Respondent-Father's presentation. Underneath, that person would not be truthful, give complex inaccuracies with a self-serving nature, are hedonistic, impulsive, inpatient, irresponsible and have assaultive behavior. After collecting and reviewing collateral information, Dr. Lecci gave a formal diagnosis of Antisocial Personality Disorder to Respondent-Father. Antisocial Personality Disorder is marked by extensive lying and a complete

disregard for social or moral standards. As a result, Respondent-Father's self-report should be taken with extreme caution and should be verified by external sources whenever possible. A person with Antisocial Personality Disorder is hard to treat as this is a longstanding behavior and the person does not realize that a change in behavior is needed, and therefore will not seek assistance. Antisocial Personality Disorder is part of who that person is and does not bode well for parenting. The person would place self-interests over the best interests of the child. Adaptive change is unlikely in those with Antisocial Personality Disorder, and treatment is therefore not recommended at this time.

25. That Dr. Lecci has not evaluated Respondent-Father since 2014 and cannot give a current diagnosis but a change would be unusual due to Respondent-Father's lack of interest in treatment or change.

26. That Mr. Joseph Rengifo evaluated Respondent-Father on March 25, 2019. Attorney Oring moved to introduce into evidence as *Respondent-Father's Exhibit "1"*, Respondent-Father's Treatment Report dated March 25, 2018. No party present objected and said exhibits were received into evidence. Mr. Rengifo was qualified as an expert in clinical psychology and counseling.

27. That Mr. Rengifo diagnosed Respondent-Father with Adjustment Disorder, unspecified, and Personal History of Spouse or Partner Violence, Physical. This diagnosis came from Respondent-Father's self-report and diagnostic/standardized tests. Respondent-Father provided Mr. Rengifo with maybe four pages of Dr. Lecci's report, less than fifteen minutes worth of reading, and without the addendum in which Dr. Lecci's confirmed Respondent-Father's diagnosis. Mr. Rengifo was not aware that Dr. Lecci had confirmed his diagnosis of Antisocial Personality Disorder for Respondent-Father, of the physical abuse allegations made by the child to whom his rights were terminated, of the physical allegation made by a former girlfriend, of the extent of physical violence and

use of weapons, that Respondent-Father was not a victim as he reported, or of Respondent-Father's drug use. Mr. Rengifo is a counselor and does not prepare a psychological evaluation but believes he needed this information to complete a proper diagnosis and treatment plan.

28.    That Mr. Rengifo met with Respondent-Father four times. The first meeting was for screening, the second and third were evaluations, and the fourth was for information gathering and developing a treatment plan. Based on the information that Respondent-Father provided, Mr. Rengifo opined that Respondent-Father currently suffers from anger issues but he has not seen Respondent-Father enough to determine a complete diagnosis. Mr. Rengifo uses weekly meetings to work a treatment plan and the length of that treatment is dependent on the information provided by the client and that client's individual progress. A treatment plan has not [been] discussed with Respondent-Father because Respondent-Father has cancelled his appointments since the information gathering meeting.

. . . .

36.    That there are still concerns with the lack of efforts by Respondent-Father, as well as his anger management, prior termination of parental rights, and lack of mental health treatment.

. . . .

42.    That parental rights of Respondent-Father to [I.S.D.] were terminated by this [c]ourt on February 3, 2016 in New Hanover County Case Number 14 JT 84, In the Matter of [I.S.D.].

. . . .

53.    The Court took judicial notice of the underlying 17 JA 400 file as the North Carolina Court of Appeals allows including all attachments to the Petition for Termination

> of Parental Rights consisting of orders and the birth certificate of the child. The Court notes that the child has been in the legal custody of [DSS] since April 13, 2017 and is placed in a pre-adoptive foster home.

"Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58 (citation omitted).

Respondent-father asserts that findings of fact 12, 15–16, 23–28, 31–32, 36–37, 39–40, 42, 44, 47–48, and 53 are not supported by sufficient evidence. We disagree.

We initially note that in reviewing the findings, we limit our review to those challenged findings that are necessary to support the trial court's determination that respondent-father's parental rights should be terminated pursuant to N.C.G.S. § 7B-1111(a)(9). *In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58–59 (citing *In re Moore*, 306 N.C. at 404, 293 S.E.2d at 133). Here, findings of fact 31–32, 37, 39–40, and 47 pertain to the trial court's conclusions that grounds existed to terminate respondent-father's parental rights for neglect, failure to make reasonable progress, or failure to legitimize Natasha. N.C.G.S. § 7B-1111(a)(1), (2), and (5). Findings of fact 44 and 48 do not concern grounds for termination, but instead pertain to the trial court's determination that termination of respondents' parental rights would be in Natasha's best interests. N.C.G.S. § 7B-1110(a). We note that respondent-father does not

challenge the trial court's conclusion that termination of his parental rights would be in Natasha's best interests. Thus, we decline to review these findings of fact.

Addressing respondent-father's challenges to the findings of fact relevant to the trial court's determination that grounds existed to terminate his parental rights pursuant to N.C.G.S. § 7B-1111(a)(9), we conclude that the evidence supports the challenged findings of fact. First, we address finding of fact 12, which summarizes both respondent-father's misrepresentation to DSS and the fact that his rights were terminated as to another child. Respondent-Father stipulated at the adjudicatory hearing on the initial juvenile petition that his parental rights to another child had been involuntarily terminated, and that his mental health concerns did not allow him to provide a safe home for Natasha. Additionally, a social worker testified at the termination hearing that there was initial confusion regarding respondent-father's identity because he provided a fictitious name. Furthermore, respondent-father admitted at the termination hearing that he provided DSS with a false name. This finding is supported by clear, cogent, and convincing evidence of record.

Second, we address findings of fact 15, 16, and 42 regarding the termination of respondent-father's parental rights as to another child. As stated previously herein, respondent-father stipulated that his parental rights to another child had been involuntarily terminated. Furthermore, in that case the Court of Appeals held that respondent-father had not made sufficient progress on his case plan and affirmed the order terminating his parental rights to the other child. *In re I.S.D.*, 797 S.E.2d 384,

2017 WL 1056327 (N.C. Ct. App. 2017) (unpublished). These findings are properly supported by the record evidence.

Third, findings of fact 23 through 25 address (1) Dr. Lecci's qualification as an expert, (2) the admission of Dr. Lecci's *curriculum vitae* and evaluation of respondent-father, (3) respondent-father's diagnosis and testing, and (4) Dr. Lecci's opinion that a change in respondent-father would be unusual due to his lack of interest in treatment or change. Dr. Lecci's evaluation of respondent-father and his *curriculum vitae* were introduced into evidence without objection and were part of the record at the termination hearing. Respondent-father's diagnosis of antisocial personality disorder, his cognitive issues, and his behavioral issues were outlined in Dr. Lecci's evaluation. Dr. Lecci also testified regarding these issues at the termination hearing. These findings are supported by clear, cogent, and convincing evidence of record.

Fourth, we address findings of fact 26 through 28 regarding Mr. Rengifo's evaluation, diagnosis, and proposed treatment of respondent-father. Mr. Rengifo was qualified as an expert in clinical psychology and counseling, and his report was part of the record at the termination hearing. Mr. Rengifo's evaluation contains his diagnoses of respondent-father and the process by which he evaluated respondent-father. Mr. Rengifo testified that respondent-father did not provide him with the addendum to Dr. Lecci's report and thus had not provided him with all the information necessary for him to make a proper diagnosis. Mr. Rengifo also testified that he did not believe respondent-father had anger issues, but he also stated that he

did not see respondent-father enough to make a proper diagnosis. Thus, the trial court's portion of finding of fact 28 that states that Mr. Rengifo opined that respondent-father had anger issues is not supported by the evidence and is disregarded. The remainder of these findings of fact are supported by clear, cogent, and convincing evidence.

Fifth, in finding of fact 36, the trial court stated that there were still ongoing concerns regarding respondent-father's "lack of efforts . . . as well as his anger management, prior termination of parental rights, and lack of mental health treatment." This finding of fact is supported by the testimony provided by a social worker at the termination hearing. The social worker testified that prior to reunification, respondent-father needed to address several issues, including anger management, mental health, and other concerns that had arisen in connection with this prior termination of parental rights case. The social worker also testified that the only efforts made by respondent-father to access DSS services did not occur until February 2019 or later—which was after DSS filed the petition to terminate respondent-father's parental rights and after Natasha had been in DSS custody for almost two years.

Lastly, finding of fact 53 concerns the trial court taking judicial notice of the underlying case file, the date when DSS was granted custody of Natasha, and Natasha's foster home placement. These facts are supported by the record. The trial court took judicial notice of the underlying case file at the termination hearing

without objection. Furthermore, the record demonstrates that Natasha was placed in DSS custody no later than March 2017 and was placed in a pre-adoptive foster home.

Respondent-father next contends that there were insufficient findings of fact with supporting evidence to lead to the conclusion that at the time of the termination hearing he lacked the ability or willingness to establish a safe home for Natasha. We are not persuaded.

The trial court's findings of fact establish that Dr. Lecci evaluated respondent-father in 2014 and made an addendum to his report in 2015. Dr. Lecci diagnosed respondent-father with antisocial personality disorder. This disorder is "marked by extensive lying and a complete disregard for social or moral standards." The trial court found as a fact that a person with antisocial personality disorder is difficult to treat because it is "part of who that person is." The trial court also found that respondent-father's disorder "does not bode well for parenting" and that "[t]he person would place self-interests over the best interests of the child."

Additionally, the trial court found that a person with antisocial personality disorder was unlikely to change and that change would be "unusual" in respondent-father's case due to his "lack of interest in treatment or change." Respondent-father's later conduct, which was consistent with Dr. Lecci's diagnosis, only served to confirm that respondent-father still suffered from antisocial personality disorder. Specifically, after DSS filed the juvenile petition alleging that Natasha was neglected and dependent, respondent-father lied to DSS by providing a false name and date of birth

in order to have Natasha placed with him. Furthermore, when respondent-father was evaluated by Mr. Rengifo in 2019, he provided Mr. Rengifo with only part of Dr. Lecci's report. Conspicuously absent from the portion of Dr. Lecci's report that respondent-father provided to Mr. Rengifo was Dr. Lecci's diagnosis of antisocial personality disorder. This exemplifies Dr. Lecci's opinion that because of respondent-father's disorder, "continued and longstanding dishonesty would be expected." Respondent-father's failure to provide Mr. Rengifo with a full and accurate report is also consistent with another feature of antisocial personality disorder, which is lying in order to present oneself favorably.

Finally, we note the trial court's finding of fact that Mr. Rengifo was unable to discuss a treatment plan with respondent-father because respondent-father cancelled his appointments. These findings of fact are all supported by clear, cogent, and convincing evidence of record, and they fully support the trial court's conclusion that respondent-father lacked the ability or willingness to establish a safe home for Natasha, and that his argument that this conclusion is not supported by the evidence and the findings of fact is without merit.

Respondent-father further argues that the trial court relied solely on an outdated 2014 psychological report to determine that he had antisocial personality disorder and that he could not effectively raise Natasha, and he argues that there was insufficient evidence that he lacked the ability or willingness to provide a safe home for Natasha at the time of the termination hearing. However, even assuming

*arguendo* that the diagnosis was stale, the trial court's findings of fact detailed above support its conclusion that respondent-father was unable to provide a safe home for Natasha at the time of the termination hearing. The evidence and findings of fact discussed above demonstrate: (1) the fact that change in respondent-father would be unexpected; (2) his apparent lack of interest in treatment or change; (3) his more recent incidents of deception and dishonesty, which were consistent with his diagnosis; and (4) that his cancellation of appointments resulted in Mr. Rengifo being unable to discuss a treatment plan with him. Therefore, respondent-father's argument that the record evidence and the trial court's findings fail to establish that he lacked the ability to provide Natasha with a safe home at the time of the termination hearing is without merit.

Respondent-father concedes in his brief, and there are numerous supported findings of fact in the record, that his parental rights with respect to another child have been terminated involuntarily by a court of competent jurisdiction. For the reasons discussed above, we further conclude that the record evidence and findings of fact support the trial court's determination that respondent-father lacked the willingness or ability to establish a safe home for Natasha. Accordingly, we hold that the trial court did not err by concluding that grounds existed pursuant to N.C.G.S. § 7B-1111(a)(9) to terminate respondent-father's parental rights.

The trial court's conclusion that a ground for termination existed pursuant to N.C.G.S. § 7B-1111(a)(9) is sufficient in and of itself to support termination of

respondent-father's parental rights. *In re T.N.H.*, 372 N.C. at 413, 831 S.E.2d at 62. As such, we need not address respondent-father's arguments regarding N.C.G.S. § 7B-1111(a)(1), (2), and (5). Furthermore, respondent-father does not challenge the trial court's conclusion that termination of his parental rights was in Natasha's best interests. *See* N.C.G.S. § 7B-1110(a). Accordingly, we affirm the trial court's order terminating respondent-father's parental rights.

II.     Respondent-Mother

Respondent-mother's sole argument on appeal is that the trial court abused its discretion when it determined that termination of her parental rights was in Natasha's best interests. We disagree.

If the trial court finds a ground to terminate parental rights under N.C.G.S. § 7B-1111(a), it proceeds to the dispositional stage where it must "determine whether terminating the parent's rights is in the juvenile's best interest" based on the following factors:

> (1)     The age of the juvenile.
>
> (2)     The likelihood of adoption of the juvenile.
>
> (3)     Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4)     The bond between the juvenile and the parent.
>
> (5)     The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.

(6)     Any relevant consideration.

N.C.G.S. § 7B-1110(a). The trial court's assessment of a juvenile's best interest at the dispositional stage is reviewed only for abuse of discretion. *In re D.L.W.*, 368 N.C. at 842, 788 S.E.2d at 167; *In re L.M.T.*, 367 N.C. 165, 171, 752 S.E.2d 453, 457 (2013). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).

Here, in its termination order, the trial court found as fact:

> 44.     That there is a bond between Respondent-Parents and the Juvenile.
>
> 45.     That the child is strongly bonded with her foster parents who [have] been addressing her medical, emotional, educational and daily needs. Her school attendance has improved as have her grades. She is in the girl scouts and attends church on a weekly basis. She is in the same foster [home] as her sister, who was removed from Respondent-Mother's care at the same time. She is thriving and improving by leaps and bounds.
>
> 46.     That the foster parents are eager to adopt this minor child.
>
> . . . .
>
> 48.     That the conduct of Respondent-Parents . . . has been such as to demonstrate that they will not promote the minor child's health, physical and emotional wellbeing and there is a foreseeable likelihood of repetition of neglect of this child. It is in the best interests of [Natasha] that the parental rights of Respondent-Parents and Unknown Father are terminated.

49.     That Attorney Advocate Morey Everett moved to introduce into evidence as *Guardian ad Litem's Exhibit "1"*, a detailed report for the Court dated April 8, 2019, prepared by Peter Maloff, Volunteer Guardian ad Litem. Ms. Maloff was present at the time of the entry of *Guardian ad Litem's Exhibit "1"*. No objection was made and said report was received into evidence and considered by the Court on the issue of best interest.

50.     That [Natasha] is ten years old. She is bonded with her foster parents, who are eager to adopt her. She is making progress in her current home, which is providing her with a safe and stable environment in which to thrive. The termination of parental rights of the Respondent-Parents and Unknown Father will aid in establishment of the permanent plan of adoption, as this is the only obstacle to adoption at this time.

51.     That taking into consideration all of the factors detailed above, that the best interests of [Natasha] would be served by the termination of the parental rights of [respondents], and that those rights are terminated so that the child can be afforded an opportunity for adoption and permanence. After twenty-six (26) months in [DSS's] care, the child is no closer to returning home. She is currently in a foster home that is meeting all of her needs with foster parents that are eager to adopt her. Additionally, the child is young, there needs to be a permanent plan for the child, and this family can provide it. Termination of Respondent-Parents' . . . parental rights would help achieve the permanent plan of adoption and provide the permanence this child deserves.

Dispositional findings not challenged by respondent-mother are binding on appeal. *In re Z.L.W.*, 372 N.C. 432, 437, 831 S.E.2d 62, 65 (2019) (citation omitted). Here, respondent-mother challenges finding of fact 51. However, evidence in the record supports the trial court's finding of fact. The evidence demonstrates that

Natasha was removed from respondent-mother's care in February 2017 and the termination hearing was held in March and April of 2019. Therefore, Natasha was not in respondent-mother's care for a span of twenty-six months. Respondent-mother does not contest the trial court's conclusion that grounds existed to terminate her parental rights, and we have determined that grounds existed to terminate respondent-father's parental rights pursuant to N.C.G.S. § 7B-1111(a)(9).

In further support of finding of fact 51, regarding Natasha's foster home, a social worker testified that (1) Natasha had been in the foster home for almost two years, (2) her foster mom "attends to all of [Natasha's] medical needs," (3) her attendance and grades at school were "right back where [they] should be," and (4) "she participate[d] in Girl Scouts." Additionally, the guardian *ad litem*'s report to the trial court indicated that Natasha's foster parents were interested in adopting her. The social worker further testified that (1) the foster home was a stable environment for Natasha, (2) the only remaining obstacle to adoption was termination of respondents' parental rights, and (3) it was in Natasha's best interests that Natasha be adopted by the foster parents. This evidence supports the challenged finding of fact.

The remaining portion of finding of fact 51 contains the trial court's ultimate finding that Natasha's best interests would be served by termination of respondents' parental rights. "[A]n 'ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact' and should 'be distinguished from

the findings of primary, evidentiary, or circumstantial facts.'" *In re N.D.A.*, 373 N.C. 71, 76, 833 S.E.2d 768, 773 (2019) (quoting *Helvering v. Tex-Penn Oil Co.*, 300 U.S. 481, 491, 57 S. Ct. 569, 574, 81 L. Ed. 755, 762 (1937)). This Court reviews termination orders "to determine whether the trial court made sufficient factual findings to support its ultimate findings of fact and conclusions of law, regardless of how they are classified in the order." *In re Z.A.M.*, 839 S.E.2d 792, 798 (N.C. 2020).

We initially note that the trial court properly considered the statutory factors set forth in N.C.G.S. § 7B-1110(a) when determining Natasha's best interests. The trial court made uncontested findings of fact that (1) Natasha had a strong bond with her foster parents, (2) the foster parents were providing for Natasha's needs, (3) Natasha was thriving in their care, and (4) termination of respondents' parental rights would aid in the permanent plan of adoption.

The bulk of respondent-mother's argument concerns her claims that the trial court failed to consider: (1) the importance of preserving family integrity; (2) the "devastating affect" that termination of respondents' parental rights would have on Natasha; and (3) the fact that respondent-father was "perfectly capable of providing a stable and loving home for Natasha." We disagree.

While the stated policy of the Juvenile Code is to prevent "the unnecessary or inappropriate separation of juveniles from their parents," N.C.G.S. § 7B-100(4) (2019), "the best interests of the juvenile are of paramount consideration by the court and . . . when it is not in the juvenile's best interest to be returned home, the juvenile

will be placed in a *safe, permanent home within a reasonable amount of time.*" N.C.G.S. § 7B-100(5) (emphasis added); *see also In re Montgomery*, 311 N.C. at 109, 316 S.E.2d at 251 ("[T]he fundamental principle underlying North Carolina's approach to controversies involving child neglect and custody [is] that the best interest of the child is the polar star."). Thus, while preserving family integrity is an appropriate consideration in the dispositional phase of the termination hearing, the best interests of the juvenile remain paramount.

Here, the trial court also found that respondents' conduct demonstrated that they would not promote Natasha's health, physical, and mental well-being. The trial court further found, after consideration of all the statutory factors, that Natasha was no closer to returning home than she was on the day she entered into DSS's care. Meanwhile, a family who was meeting all of her needs was willing to adopt her and provide her with permanence. Thus, the trial court could properly conclude based on its dispositional findings of fact that preserving family integrity was not in Natasha's best interests.

The remainder of respondent-mother's arguments are contingent on respondent-father's retention of his parental rights. However, because we have already determined that the trial court properly terminated respondent-father's parental rights, these arguments lack merit. We therefore hold that the trial court's conclusion that termination of respondent-mother's parental rights was in Natasha's best interests did not constitute an abuse of discretion.

Conclusion

We conclude that the trial court correctly determined that grounds existed pursuant to N.C.G.S. § 7B-1111(a)(9) to terminate respondent-father's parental rights. We further conclude that the trial court did not abuse its discretion by determining that termination of respondent-mother's parental rights was in Natasha's best interests. Accordingly, we affirm the trial court's order terminating respondents' parental rights.

AFFIRMED.